Nos. 23-4354 and 23-4356

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

RENO MAY, ET AL.,

*Plaintiffs-Appellees,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellant.*

————————————

## On Appeal from the United States District Court
## for the Central District of California
No. 8:23-cv-01696-CJC-ADSx
The Honorable Cormac J. Carney, Judge

————————————

## APPELLANT'S OPENING BRIEF

————————————

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
MARK R. BECKINGTON
*Supervising Deputy Attorneys General*

ROBERT L. MEYERHOFF
TODD GRABARSKY
JANE REILLEY
LISA PLANK
CAROLYN DOWNS
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6177
Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta as Attorney
General of the State of California*

January 19, 2024

(*Additional caption appears on next page*)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————

MARCO ANTONIO CARRALERO, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellant*.

—————————

## On Appeal from the United States District Court
## for the Central District of California
No. 8:23-cv-01798-CJC-ADSx
The Honorable Cormac J. Carney, Judge

# TABLE OF CONTENTS

<strong>Page</strong>

Introduction ...................................................................................... 1

Jurisdictional Statement ................................................................... 2

Statement of the Issues .................................................................... 2

Addendum of Statutory Provisions ................................................. 2

Statement of the Case ...................................................................... 3

    A.    California Maintains Longstanding Sensitive Places
           Restrictions ............................................................................. 3

    B.    Bruen Reaffirms the Validity of Sensitive Places Restrictions ........... 3

    C.    SB 2 Implements a Bruen-Compliant Licensing Scheme That
           Also Prohibits Firearms in Sensitive Places ........................... 5

    D.    The District Court Enjoins Crucial Aspects of SB 2 ............. 7

Summary of the Argument ............................................................... 8

Standard of Review .......................................................................... 9

Argument .......................................................................................... 11

I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Sensitive
    Places Challenges ................................................................... 11

    A.    Governments May Restrict Firearms in Sensitive Places ............... 11

    B.    Three Principal Attributes Support a Location's Designation as
           a Sensitive Place .................................................................... 13

    C.    Each of the Challenged Provisions of SB 2 Is Constitutional ........... 17

         1.    Certain Challenged Locations Are Sensitive Because of
              the Activities that Take Place There ............................. 21

              a.    Places of Worship Without Operator's Consent
                   (Section 26230(a)(22)) ................................... 21

              b.    Financial Institutions (Section 26230(a)(23)) ............... 24

         2.    Certain Challenged Locations Are Sensitive because of
              Their Physical Nature ................................................... 26

              a.    Public Transit (Section 26230(a)(8)) ............................. 26

i

# TABLE OF CONTENTS
## (continued)

Page

        b.    Places Where Liquor Is Sold for Consumption on Site (Section 26230(a)(9)) ................................30

        c.    Public Gatherings and Special Events (Section 26230(a)(10))......................................................32

        d.    Casinos, Stadiums, and Amusement Parks (Sections 26230(a)(15), (a)(16), and (a)(19))................36

    3.    Certain Challenged Locations Are Sensitive Because of the Vulnerable People Who Congregate There ........................38

        a.    Health Care Facilities (Section 26230(a)(7)) ................38

        b.    Playgrounds and Youth Centers (Section 26230(a)(11))......................................................40

        c.    Parks and Athletic Facilities (Sections 26230(a)(12), (a)(13))..............................................42

        d.    Public Libraries, Zoos, and Museums (Section 26230(a)(17), (a)(20))....................................47

    4.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Challenges to the Parking Lot Provisions..................................49

II.    SB 2's Private Property Provision (Section 26230(a)(26)) Is Constitutional........................................................................51

III.    The Other Preliminary Injunction Factors Do Not Support the District Court's Injunction....................................................58

Conclusion ............................................................................60

Statement of Related Cases....................................................61

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Alexander v. State*
   27 Tex. App. 533, 537 (1889)................................................................15, 35

*Andrews v. State*
   50 Tenn. 165 (1871)................................................................22, 34

*Antonyuk v. Chiumento*
   89 F.4th 271 (2d Cir. 2023) ................................................*passim*

*Baird v. Bonta*
   81 F.4th 1036 (9th Cir. 2023) ................................................32

*Bonidy v. U.S. Postal Serv.*
   790 F.3d 1121 (10th Cir. 2015) ................................................14, 25, 49

*Brooks v. State*
   15 Tex. App. 88, 90 (1883)................................................................35

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*
   29 F.4th 468 (9th Cir. 2022) ................................................10

*Christopher v. Ramsey Cty.*
   621 F. Supp. 3d 972 (D. Minn. 2022)................................................14

*Clapper v. Amnesty Int'l USA*
   568 U.S. 398 (2013)................................................................57

*Coal. for Econ. Equity v. Wilson*
   122 F.3d 718 (9th Cir. 1997) ................................................58

*DiGiacinto v. Rector & Visitors of George Mason Univ.*
   704 S.E.2d 365 (Va. 2011) ................................................16

*District of Columbia v. Heller*
   554 U.S. 570 (2008)................................................................*passim*

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Duncan v. Bonta*
 83 F.4th 803 (9th Cir. 2023) (en banc) ................................................58

*Fla. Retail Fed'n, Inc. v. Att'y Gen. of Fla.*
 576 F. Supp. 2d 1281 (N.D. Fla. 2008) ............................................53

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*
 528 U.S. 167 (2000)..........................................................................56

*GeorgiaCarry.Org, Inc. v. Georgia*
 687 F.3d 1244 (11th Cir. 2012) ........................................................53

*Goldstein v. Hochul*
 2023 WL 4236164 (S.D.N.Y. June 28, 2023) .......................22, 23, 57

*Hecox v. Little*
 79 F.4th 1009 (9th Cir. 2023) ........................................................9, 10

*Hill v. State*
 53 Ga. 472 (1824) ........................................................................22, 34

*Hoven v. Walgreen Co.*
 751 F.3d 778 (6th Cir. 2014) .............................................................53

*Jarvis v. Vill. Gun Shop*
 53 F. Supp. 3d 426 (D. Mass. 2014)..................................................54

*Jones v. Bonta*
 2023 WL 8530834 (S.D. Cal. Dec. 8, 2023) .....................................29

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
 941 F.2d 970 (9th Cir. 1991) .............................................................10

*Maryland v. King*
 567 U.S. 1301 (2012) ........................................................................58

*Maupin v. State*
 17 S.W. 1038 (Tenn. 1890)................................................................35

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Md. Shall Issue, Inc. v. Montgomery Cnty.*
  2023 WL 4373260 (D. Md. July 6, 2023) ............................................22, 39, 50

*New York State Rifle & Pistol Ass'n v. Bruen*
  597 U.S. 1 (2022)................................................................................*passim*

*Nordyke v. King*
  563 F.3d 439 (9th Cir. 2009) ........................................................14, 15

*Owens v. State*
  3 Tex. App. 404, 406 (1878).................................................................34

*Price v. City of Stockton*
  390 F.3d 1105 (9th Cir. 2004) .............................................................50

*Siegel v. Platkin*
  653 F. Supp. 3d 136 (D.N.J. 2023) ......................................................45

*State v. Pigg*
  85 Mo. App. 399 (1900) .......................................................................35

*State v. Reando*
  (Mo. 1878) ............................................................................................22

*State v. Shelby*
  2 S.W. 468 (Mo. 1886) .........................................................................34

*Stormans, Inc. v. Selecky*
  586 F.3d 1109 (9th Cir. 2009) .............................................................59

*United States v. Alaniz*
  69 F.4th 1124 (9th Cir. 2023) ..............................................................32

*United States v. Allam*
  2023 WL 5846534 (E.D. Tex. June 14, 2023) ...............................46, 49

*United States v. BNS Inc.*
  858 F.2d 456 (9th Cir. 1988) ...............................................................50

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Class*
930 F.3d 460 (D.C. Cir. 2019) ..................................................................51

*United States v. Davis*
304 F. App'x 473 (9th Cir. 2008) ..............................................................16

*United States v. Dorosan*
350 F. App'x 874 (5th Cir. 2009) ..........................................................25, 49

*United States v. Langan*
263 F.3d 613 (6th Cir. 2001) ....................................................................24

*United States v. Marique*
2023 WL 5338069 (D. Md. Aug. 18, 2023) ..............................................29

*United States v. Marx*
485 F.2d 1179 (10th Cir. 1973) ................................................................24

*United States v. Masciandaro*
648 F. Supp. 2d 779 (E.D. Va. 2009) ...................................................15, 17

*United States v. Walter*
2023 WL 3020321 (D.V.I. Apr. 20, 2023) .............................................41, 49

*United States v. Walters*
2008 WL 2740398 (D.V.I. July 15, 2008) ..................................................16

*W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*
2023 WL 5659040 (S.D.W. Va. Aug. 31, 2023) .........................................53

*W. Va. State Bd. of Educ. v. Barnette*
319 U.S. 624 (1943) ..................................................................................57

*We The Patriots, Inc. v. Grisham*
2023 WL 6622042 (D.N.M. Oct. 11, 2023) ...............................................40

*We the Patriots USA, Inc. v. Grisham*
2023 WL 6377288 (D.N.M. Sept. 29, 2023) ..............................................41

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Wynne v. State*
    51 S.E. 636 (Ga. 1905) ........................................................35

**STATUTES**

12 U.S.C.A. § 1882 ...............................................................24

18 U.S.C.A. § 2113 ...............................................................24

28 U.S.C. § 1292(a)(1) ...........................................................2

28 U.S.C. § 1331 ..................................................................2

Cal. Penal Code § 626.9 ..........................................................3

Cal. Penal Code § 26150 ..........................................................5

Cal. Penal Code § 26150 ..........................................................5

Cal. Penal Code § 26155 ..........................................................5

Cal. Penal Code § 26230 .........................................................51

Cal. Penal Code § 25850 .........................................................59

**CONSTITUTIONAL PROVISIONS**

First Amendment.............................................................56, 57

Second Amendment ........................................................*passim*

**COURT RULES**

Ninth Cir. R. 28-2.7 .............................................................2

**OTHER AUTHORITIES**

Carina B. Gryting & Mark A. Frassetto, *NYRSPA v. Bruen and the
    Future of the Sensitive Places Doctrine*, 63 B.C. L. Rev E. Supp.
    I.-60..........................................................................16

vii

# TABLE OF AUTHORITIES
## (continued)

**Page**

Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28
Wm. & Mary Bill Rts. J. 459 (2019) ..................................................................14

David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303 (2016)..............................18

David B. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13
Charleston L. Rev. 205 (2018) .........................................................................26

## INTRODUCTION

The Supreme Court has repeatedly recognized that restrictions on firearms in sensitive places are "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626-627 & n.26 (2008). Consistent with that precedent, California's Legislature enacted Senate Bill 2 to identify certain sensitive places in which firearms are generally prohibited. Yet the district court deemed many of California's sensitive places restrictions invalid under the Second Amendment, issuing a sweeping preliminary injunction that allows concealed carry licensees to bring their firearms on playgrounds, in public libraries, and into the parking lots of courthouses, jails, and even preschools, among other places.

To reach this result, the district court misapplied the *Bruen* standard, improperly discounted the Attorney General's historical evidence, and adopted a test that would effectively bar any modern regulation that does not have a Founding- or Reconstruction-era historical twin. Under a faithful application of *Bruen*, all of the challenged sensitive places restrictions are constitutional because they are "relevantly similar" to historical analogues that fit squarely within "the Nation's tradition of firearm regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24, 29–30 (2022). Indeed, in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), the Second Circuit upheld several sensitive places restrictions similar to those at issue here.

1

The district court also erred in ruling that Plaintiffs are likely to succeed on their challenge to California's restriction on carrying firearms on private commercial property unless the operator of the property expressly allows it (the so-called "default rule" for private property).  The Second Amendment does not confer any right to carry firearms on private property, but even if it did, the default rule finds ample support in history and tradition.  The district court similarly erred in concluding that the other preliminary injunction factors weigh in favor of issuing an injunction.

The district court's decision to grant a preliminary injunction should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' federal constitutional claims under 28 U.S.C. § 1331.  The Attorney General timely appealed on December 22, 2023, two days after the injunction issued.  1-ER-2216–17.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court abused its discretion in granting a preliminary injunction enjoining the enforcement of every challenged provision of SB 2.

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions has been filed with this brief. Ninth Cir. R. 28-2.7.

2

## STATEMENT OF THE CASE

### A.   California Maintains Longstanding Sensitive Places Restrictions

California has long restricted carrying firearms in certain sensitive places. Before SB 2, the State restricted carrying firearms in school zones (Cal. Penal Code § 626.9); state or local public buildings (*id*. § 171b); the State Capitol and its grounds, any legislative office, the offices of the Governor and other constitutional officers, and Senate and Assembly hearing rooms while a hearing is conducted (*id*. § 171c); the Governor's Mansion and Senate and Assembly member residences without permission (*id*. § 171d); airports (*id*. § 171.5); and the "sterile areas" of public transportation facilities (*id*. § 171.7). Plaintiffs do not challenge any of these long-standing restrictions.

### B.   *Bruen* Reaffirms the Validity of Sensitive Places Restrictions

In *Bruen*, the Supreme Court announced a standard for evaluating Second Amendment claims "centered on constitutional text and history."  597 U.S. at 22. Under the *Bruen* framework, the initial inquiry (i.e., stage one) is whether "the Second Amendment's plain text covers an individual's conduct."  *Id.* at 24.  If so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" (i.e., stage two).  *Id.*

3

Before *Bruen*, the Court had already addressed the constitutional validity of laws that restrict firearms in sensitive places.  In *Heller*, the Court recognized that the Second Amendment protects an individual right to keep and bear arms.  554 U.S. at 635.  But it made clear that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."  *Id*. at 626.  And it further stated that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  *Id*. at n.26.  In *McDonald v. City of Chicago, Ill.*, the Court underscored the "assurances" "made [] clear in *Heller*" that sensitive places restrictions are presumptively lawful.  561 U.S. 742, 786 (2010).

Then, in *Bruen*, the Court reaffirmed that sensitive places restrictions are constitutionally sound.  The Court cited approvingly "*Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,'" *Bruen*, 597 U.S. at 30, and noted that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses," the Court was "also aware of no disputes regarding the lawfulness of such prohibitions," *id*. (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018)).  The Court "assume[d] it settled that these locations were

4

'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.*; *see also id.* at 81 (Kavanaugh, J., concurring). Indeed, all the Justices in *Bruen* agreed that States may forbid firearms in sensitive places. *Id.* at 114 (Breyer, J., dissenting) ("The Court affirms *Heller*'s recognition that States may forbid public carriage in 'sensitive places.'").

### C.   SB 2 Implements a *Bruen*-Compliant Licensing Scheme That Also Prohibits Firearms in Sensitive Places

Before *Bruen*, California law established a "may issue" licensing regime, authorizing a licensing authority to issue a concealed carry weapon (CCW) license only to applicants who demonstrated "good cause" and met other licensing requirements. Cal. Penal Code § 26150, *amended by* Senate Bill 2 (2023).[1] In the wake of *Bruen*, California enacted SB 2 to implement a shall-issue licensing regime that eliminates discretion to withhold a license when conditions are met and no longer requires CCW applicants to establish "good cause" to obtain a license. *See* Cal. Penal Code §§ 26150, 26155, 26202, *amended by* Senate Bill 2 (2023).

SB 2 includes other provisions designed to address California's "compelling interests in protecting both individual rights and public safety." SB 2 (2023–2024 Reg. Sess.), § 1(a). In approving SB 2, the Legislature cited "a wealth of empirical

---

[1] SB 2's sensitive places restrictions also apply to those individuals who, as residents of counties with fewer than 200,000 people, have received a license to carry openly. *See* Cal. Penal Code §§ 26150(b)(2), 26155(b)(2), 26230(1).

studies [showing] that crime is higher when more people carry firearms in public places" (*id.* ¶ 1(d)) and found that "[b]roadly allowing individuals to carry firearms in public areas increases the number of people wounded and killed by gun violence" (*id.* ¶ 1(e)).

As relevant here, SB 2 prohibits concealed carry licensees from carrying firearms into certain locations identified as sensitive places. This case does not involve many of those locations: schools ((a)(1)), preschools ((a)(2)), executive or legislative branch buildings ((a)(3)), judicial buildings ((a)(4)), local government buildings ((a)(5)), correctional facilities ((a)(6)), higher education facilities ((a)(14)), airports or passenger vessel terminals ((a)(18)), nuclear facilities ((a)(21)), law enforcement facilities ((a)(24)), polling places ((a)(25)), and any other places prohibited by other provisions of state, federal, or local law ((a)(27)-(29)), except as to those provisions which also restrict carry in the parking lots of those places. *May, et al. v. Bonta*, Case No. 23-cv-01696, Dkt. 13; *Carralero, et al. v. Bonta*, Case No. 23-cv-01798, Dkt. 7.

The provisions at issue here bar licensees from carrying firearms in health care facilities ((a)(7)), on public transit ((a)(8)), in establishments that sell liquor for consumption on site ((a)(9)), at public gatherings and special events ((a)(10)), playgrounds and youth centers ((a)(11)), local parks and athletic facilities ((a)(12)), state parks ((a)(13)), casinos ((a)(15)), stadiums ((a)(16)), libraries ((a)(17)),

amusement parks ((a)(19)), museums and zoos ((a)(20)), houses of worship without the operator's consent ((a)(22)), and financial institutions ((a)(23)), on private property without the owner's consent ((a)(26)), and in the parking lots of each of the sensitive places identified in SB 2 which were defined to include the parking lot of that place, including jails and nuclear power plants. *Id*.

SB 2 features various exceptions that facilitate the right of CCW licensees to carry in public. Among other things, licensees may carry firearms if they need to walk through a public gathering, local park, or athletic facility to access their residence, place of business, or vehicle. *Id*., (a)(10), (a)(12)). They may also carry firearms while traveling along a public right of way that touches or crosses a designated sensitive place. *Id.*, (e). Other provisions protect the right of licensees to transport firearms in their vehicles (*id.*, (b)), and allow them, with certain exceptions, to store firearms in their vehicles in the parking lots of sensitive places (*id.*, (c)).

### D. The District Court Enjoins Crucial Aspects of SB 2

The *May* and *Carralero* Plaintiffs filed lawsuits challenging certain provisions of SB 2. *May* Dkt. 1; *Carralero* Dkt. 1. In each case, Plaintiffs moved for a preliminary injunction. *May* Dkt. 13, 13-1; *Carralero* Dkt. 6, 6-1. The *May* Plaintiffs submitted a declaration from their purported historical expert, Clayton Cramer, in support of their motion (*May* Dkt. 13-7); the *Carralero* Plaintiffs did

7

not submit any expert declarations. The Attorney General filed oppositions to both motions supported by thirteen declarations from expert historians (*May* Dkt. 21-1 to 21-13; *Carralero* Dkt. 20-1 to 20-13), as well as a four-volume Compendium of Historical Laws and Treatises (*May* Dkt. 22; *Carralero* Dkt. 21).

The district court granted both motions in their entirety and entered a preliminary injunction in each case. *May* Dkt. 45 and 46; *Carralero* Dkt. 41 and 42. The Attorney General appealed the district court's order and preliminary injunction in both cases (*May* Dkt. 47; *Carralero* Dkt. 43), and this Court consolidated the appeals (*May* 9th Cir. Dkt. 20; *Carralero* 9th Cir. Dkt. 12).

## SUMMARY OF THE ARGUMENT

Each of the challenged provisions of SB 2 is constitutional. In the district court, the Attorney General submitted declarations from more than a dozen historians and a compendium of more than two hundred relevantly similar historical laws and contemporary secondary sources. This evidence establishes that for each challenged provision, relevantly similar historical analogues exist, and that those analogues fit squarely within the nation's historical tradition of firearms regulation.

The district court reached a contrary result through a badly misguided understanding of *Bruen*'s requirements. For example, the district court disregarded many historical analogues because those historical laws did not govern CCW

licensees who must obtain a license and undergo training and background checks. But because licensing schemes are a modern invention, no modern sensitive places restriction could ever be supported by history under the district court's approach— a result that the Supreme Court's precedents expressly foreswear.

The district court also erred in striking down SB 2's private property default rule. First, the district court incorrectly concluded that the private property default rule implicates the plain text of the Second Amendment. Second, the district court erred in concluding that the Attorney General failed to identify relevantly similar historical analogues. And the private property provision does not violate the First Amendment's prohibition on compelled speech, as the *May* Plaintiffs complain it does. The remainder of the district court's analysis concerning equitable considerations was also flawed. Its decision granting a preliminary injunction should be reversed.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023) (emphasis in original) (internal quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

9

equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Although "[t]his court reviews the district court's decision to grant or deny a preliminary injunction for abuse of discretion," "[t]he district court's interpretation of the underlying legal principles . . . is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (internal quotation marks omitted). "A district court's decision is based on an erroneous legal standard if: (1) the court did not employ the appropriate legal standards that govern the issuance of a preliminary injunction; or (2) in applying the appropriate standards, the court misapprehended the law with respect to the underlying issues in the litigation." *Id.* (internal quotation marks omitted). A district court also abuses its discretion if its application of the law was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (internal quotation marks omitted). Furthermore, "[i]njunctive relief . . . must be tailored to remedy the specific harm alleged," and "[a]n overboard injunction is an abuse of discretion." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

## ARGUMENT

I. **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR SENSITIVE PLACES CHALLENGES**

### A. Governments May Restrict Firearms in Sensitive Places

*Heller*, *McDonald*, and *Bruen* set forth several core principles for analyzing sensitive places restrictions. And the Second Circuit's recent decision in *Antonyuk* helpfully elaborates on these principles.

*First*, the government need not identify numerous historical analogues to justify a modern regulation of sensitive places. Indeed, the Supreme Court reaffirmed in *Bruen* that firearms may be prohibited in legislative assemblies and polling places, even though it identified only a few historical analogues for such restrictions. 597 U.S. at 30 (citing Kopel & Greenlee, *The "Sensitive Places" Doctrine*, *supra*, at pp. 229–236, 244–247, which in turn cites only two Maryland colonial laws restricting weapons in legislative assemblies and one 18th century Delaware law restricting weapons in polling places); *see Antonyuk*, 89 F.4th at 304 ("depending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition"). Particularly when there are relatively few historical analogues, the absence of historical "disputes regarding the lawfulness" of a category of sensitive places restrictions will tend to show that the restriction is constitutional. *Bruen*, 597 U.S. at 30.

11

*Second*, although "not all history is created equal," courts may consider any probative evidence that "demonstrate[s] that the [challenged] regulation is consistent with this Nation's historical traditions of firearm regulation." *Bruen*, 597 U.S. at 17, 34. Courts should not limit their analysis to state laws that were on the books in 1791 or 1868. *See id.* at 38–70 (analyzing wide range of historical evidence); *Antonyuk*, 89 F.4th at 304–305 (explaining why Reconstruction-era laws may be relevant); *id*. at 359–360 (analyzing local ordinances).

*Third*, the categories of sensitive places restrictions specifically identified as constitutional by the Supreme Court—"schools and government buildings," *Heller*, 554 U.S. at 626, and "legislative assemblies, polling places, and courthouses," *Bruen*, 597 U.S. at 30—are merely examples of such permissible restrictions. *Id*. (using "*e.g.*," rather than "*i.e.*," in listing "legislative assemblies, polling places, and courthouses"); *Heller*, 554 U.S. at 626 (recognizing "longstanding prohibitions . . . forbidding the carrying of firearms in sensitive places *such as* schools and government buildings") (emphasis added); *id*. n.26 (these "presumptively lawful regulatory measures" were listed "only as examples; our list does not purport to be exhaustive").

And *fourth*, where they are designed to address "unprecedented societal concerns" or "dramatic technological changes," sensitive places restrictions must be evaluated under what *Bruen* describes as a "more nuanced" analytical approach

12

because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27; *see also id*. at 30 ("[C]ourts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.").  In applying this more nuanced approach, courts should bear in mind that "the absence of a distinctly similar historical regulation . . . can only prove so much." *Antonyuk*, 89 F.4th at 301; *see id.* at 301-302 (explaining that "[r]easoning from historical silence is . . . risky" because there may be many reasons why legislative bodies did not legislate to the limits of their constitutional authority).

## B.   Three Principal Attributes Support a Location's Designation as a Sensitive Place

Applying these principles to the nation's history and tradition of sensitive places restrictions, there are at least three attributes of a given place that may support a modern restriction:  (1) the centrality of a place to civic life or the exercise of constitutional rights; (2) whether the physical nature of a place makes the presence of firearms especially dangerous; and (3) the congregation of vulnerable populations in a place.

*First*, places that are "sensitive" by virtue of the *activities taking place there* include legislative assemblies, courthouses, and other government buildings, as

13

well as polling places and locations where people exercise constitutional rights other than those guaranteed by the Second Amendment. *See Bruen*, 597 U.S. at 30 ("legislative assemblies, polling places, and courthouses"); *Heller*, 554 U.S. at 626 ("government buildings"); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) ("post offices"). This category has historical roots in laws prohibiting firearms in places of election and legislative assembly. *See* 4-ER-623–626 ("To prevent any violence or force being used at the said elections, no person shall come armed to any of them."); 4-ER-569–570 ("no one shall come into the house of Assembly (whilst the house is set) with any weapon"); *see also* 4-ER-639–641; 5-ER-782–787; 5-ER-790–793; 5-ER-846–850; 5-ER-867–868. These restrictions are intended to prevent the carry of firearms from interfering with "the production of other kinds of public goods protected by other kinds of constitutional rights." Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019).

*Second*, the *physical nature* of a place may make it "sensitive" because the presence of guns there would be especially dangerous. This is particularly true of places where "thousands of people" are "present in often crowded conditions." *Christopher v. Ramsey Cty.*, 621 F. Supp. 3d 972, 981 (D. Minn. 2022); *see Nordyke v. King*, 563 F.3d 439, 459–460 (9th Cir. 2009) (firearms can be lawfully

14

prohibited in certain "gathering places where high numbers of people might congregate"), *vacated on other grounds*, 575 F.3d 890 (9th Cir. 2009).[2]

This tradition harkens back to the longstanding prohibition on "going armed" under "such circumstances as are apt to terrify the people," including the carrying of arms in "places" where it was not "customary to make use of them." 6-ER-1184–1186. In early America, it was uncommon for civilians to carry arms in certain crowded gatherings, such as while "attending [public] meetings," 6-ER-1187–1190, or in "a place where persons were assembled for amusement." *Alexander v. State*, 27 Tex. App. 533, 537 (1889). Other early American laws reflecting these concerns involved prohibitions on firearms near parades and on trains. *See* 4-ER-668–670 (prohibiting "any non-commissioned officer or private . . . [to] come on to any parade with his musket, rifle, or pistol loaded with powder and ball, slugs or shot"); 5-ER-841–842 (making it a crime to "present or discharge any gun, pistol, or other fire arm at any railroad train, car or locomotive engine").

These laws sought to prevent the predictable consequences of carrying firearms in crowded environments. *See Alexander*, 27 Tex. App. at 537 (upholding

---

[2] Despite having been vacated, "the panel opinion in *Nordyke* is persuasive with respect to its 'sensitive places' analysis." *United States v. Masciandaro*, 648 F. Supp. 2d 779, 791 n.18 (E.D. Va. 2009), *aff'd*, 638 F.3d 458 (4th Cir. 2011), *abrogated in part on other grounds by Bruen*, 597 U.S. 1.

conviction for carrying pistol in schoolhouse holding evening entertainment).

Among other things, these laws preserved order at public gatherings, improved the

safety of travelers, and diminished the risk of panic in confined spaces. *See, e.g.*,

Carina B. Gryting & Mark A. Frassetto, *NYRSPA v. Bruen and the Future of the*

*Sensitive Places Doctrine*, 63 B.C. L. Rev. E. Supp. I.-60, I.-68 (2022) (explaining

that [t]he number of potential targets" and "the increased risk of conflict all seem

to be relevant in the historical determination that an area constitutes a sensitive

place"); *United States v. Davis*, 304 F. App'x 473, 474 (9th Cir. 2008)

(recognizing airplanes as sensitive places).

    *Third*, a place may be sensitive because of the *people* who congregate there,

particularly vulnerable groups such as children, the elderly, and those suffering

from illness. *See Heller*, 554 U.S. at 626–27; *United States v. Walters*, 2008 WL

2740398 (D.V.I. July 15, 2008), at *1 & n.1 (criminalizing possession of gun

within 1,000 feet of school does not violate the Second Amendment); *Kipke*, ___

F. Supp. 3d. ___, 2023 WL 6381503 (D. Md. Sept. 29, 2023), at *8 ("[H]ealth care

facilities . . . serve a vulnerable population, and their regulation is justified by the

protection of that population."). The frequent presence of children in a particular

location strongly indicates that the area is sensitive for Second Amendment

purposes. *See, e.g.*, *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704

S.E.2d 365, 370 (Va. 2011) (university was "sensitive place" in part because

"elementary and high school students" were there in the summer).  The sensitivity of such places finds considerable support in Reconstruction-era laws prohibiting guns in "any school room or other place where persons are assembled for educational, literary or scientific purposes."  *See* 5-ER-790–793; *see also* 5-ER-857–860; 5-ER-867–868.  These laws sought, among other things, to protect vulnerable persons who, because of their age or physical state, cannot easily escape attack or defend themselves.  *See, e.g., Masciandaro*, 648 F. Supp. 2d at 791 (explaining that "schools" are treated as sensitive places because "possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children)").

### C.  Each of the Challenged Provisions of SB 2 Is Constitutional

In opposing Plaintiffs' motions for preliminary injunction, the Attorney General submitted expert declarations from thirteen leading historians.  These experts explained, among other things, that many of the locations regulated by SB 2 did not exist in any meaningful way in the Founding and Reconstruction eras, and why firearms in analogous locations have long been restricted.  The Attorney General also submitted a compendium of more than two hundred historical laws and contemporary secondary sources, identified relevantly similar historical analogues for each challenged provision, and explained how those analogues fit within the nation's historical tradition of firearms regulation.

17

The district court made numerous errors in reaching its conclusion that every challenged provision of SB 2 is unconstitutional. While each of those errors is addressed below, the district court's most pervasive legal error should be addressed at the outset: framing its *Bruen* analysis as turning on whether the Attorney General's historical analogues are "consistent with a tradition of . . . preventing people *with special permits who have been through background checks and training* from carrying firearms." 1-ER-37 (emphasis added). Because of this improperly narrow frame of reference, the district court repeatedly refused to credit the Attorney General's historical analogues because those historical laws were not specific to gun owners who had undergone a licensing process equivalent to the modern CCW licensing regime.

*Bruen* does not support this approach to filtering out analogues. The analogical inquiry set forth in *Bruen* is not meant to impose a "straightjacket," *see Bruen*, 597 U.S. at 30, that would prohibit any modern sensitive places restriction unless the government identifies a historical analogue specific to CCW licensees. Indeed, making such a showing would not only effectively require a "historical twin," *id.*, but would also be impossible, because "[u]ntil the early twentieth century, there were no laws that required that individuals receive government permission before purchasing or borrowing a firearm." David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53

18

Harv. J. on Legis. 303, 336 (2016); *id*. at 346 ("State laws requiring a permit to purchase or a permit to possess a handgun were a rarity as of the early 1920s.").[3] The only laws in the 18th or 19th century that required governmental permission for firearms acquisition or possession were racist ones aimed at African-Americans and Native Americans. *Id*. at 336–338.

The district court's approach cannot be squared with *Bruen*'s recognition that governments may impose modern restrictions in certain sensitive places. Governments may prohibit CCW licensees—or anyone else—from carrying firearms in schools or government buildings. 597 U.S. at 30. Under the district court's approach, however, neither those sensitive places restrictions nor any others could be constitutionally valid as to CCW licensees. The district court's apparent conclusion that a state cannot recognize "*new* and analogous sensitive places" if it has a licensing regime, *id*. at 30, cannot be reconciled with *Bruen* and has not been adopted by any other court. Nor can it be reconciled with the underlying justification for sensitive places restrictions: they are justified in part to avoid chilling other-constitutionally-protected activity, *supra* pp. 13–14—a

---

[3] Despite the relatively recent emergence of licensing regimes, the Supreme Court has had no difficulty endorsing shall-issue licensing regimes designed to ensure that only law-abiding, responsible citizens carry and bear arms. *Bruen*, 597 U.S. at 38 n.9 ("nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes").

19

justification that does not turn on how well-trained or vetted a CCW licensee may be.

As explained in more detail below, this flawed approach pervades the district court's order. *See, e.g.*, 1-ER-23 (finding that the "proffered [historical] analogies" for the restriction on carry in health care facilities are not "'relevantly' similar" because SB2 . . . prevents people that law enforcement has vetted and who have been trained on the carry and use of their handguns from carrying those handguns . . . ."); 1-ER-27 (rejecting a historical analogue for the restriction on locations that sell liquor for consumption on site because it did not regulate "law-abiding citizens who have been vetted and trained"); 1-ER-31 (rejecting a historical analogue because "SB2 prohibits trained and vetted CCW permitholders from carrying firearms at any public gathering or special event"); 1-ER-36 (rejecting the Attorney General's proposed historical analogues as to "casinos, stadiums, arenas, amusement parks, or similar locations" on a similar basis); 1-ER-39 (the "government fails to present evidence of a history and tradition of prohibiting trained and vetted permitholders from carrying handguns for self-defense in places of worship").  That profoundly distorts *Bruen*.

**1.    Certain Challenged Locations Are Sensitive Because of the Activities that Take Place There**

**a.    Places of Worship Without Operator's Consent (Section 26230(a)(22))**

The Attorney General identified numerous analogues for subsection (a)(22): 5-ER-778–781 (prohibiting the carrying of firearms and deadly weapons "to any . . . place of public worship"); 5-ER-790–793 (prohibiting anyone (except for law enforcement) from carrying a gun into "any church or religious assembly"); 5-ER-846–850 (prohibiting guns and other dangerous weapons in "any place of worship while a meeting for religious purposes is being held"); *see also* 5-ER-831–833; 5-ER-853–856; 5-ER-869–871.  These historical analogues are "relevantly similar" to (a)(22) because the justifications are the same (i.e., ensuring individuals can gather for worship without fear of violence) and the burdens of SB 2 are comparatively lower because SB 2 permits firearms in a place of worship if the operator of the place of worship gives express consent.  Moreover, these historical analogues fit within a tradition of firearms regulation that extends as far back as the 15th century, when English law specifically prohibited the carrying of arms in churches and religious congregations.  4-ER-552–553 ("no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same"); *see also* 7-ER-1232.

Other district courts considering similar records have found that plaintiffs challenging restrictions on the carry of firearms in places of worship are unlikely to succeed on the merits because the historical record confirms "that houses of worship are sensitive places, where it is constitutionally permissible for the state to regulate the carrying of firearms." *See Goldstein v. Hochul*, 2023 WL 4236164 (S.D.N.Y. June 28, 2023), at *12, *appeal filed* July 6, 2023; *see also Md. Shall Issue, Inc. v. Montgomery Cnty.*, 2023 WL 4373260 (D. Md. July 6, 2023), at *10 ("The historical record . . . demonstrates a well-established and representative number of statutes that prohibited firearms in places of worship.").

Nineteenth century courts not only upheld the constitutionality of firearm prohibitions in places of worship, but also evinced the societal consensus that religious gatherings are no place for dangerous weapons. *See State v. Reando* (Mo. 1878), 5-ER-861–63 (upholding the constitutionality of Missouri's law prohibiting carry of firearms in, among other locations, churches); *Hill v. State*, 53 Ga. 472, 475 (1824) ("[C]arrying arms at . . . places of worship[] is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee"); *Andrews v. State*, 50 Tenn. 165, 182 (1871) ("[A] man may well be prohibited from carrying [or wearing] his arms to church, or other public assemblage."); *see also* 7-ER-1244 (collecting cases).  Thus, as

22

*Bruen* explained, 597 U.S. at 30, the absence of dispute over the constitutionality of these restrictions buttresses the conclusion that SB 2 and its historical analogues fit within the nation's tradition of firearms regulation.

The district court disregarded these historical statutes because they were not "evidence of a history and tradition of prohibiting trained and vetted permitholders from carrying handguns for self-defense in places of worship." 1-ER-39. As explained above, however, the government need not identify a historical twin from the 18th or 19th century that matches the modern licensing scheme that California (and most other states) employ today. *See* section I.C, *supra*.

The district court was also wrong to rely on the fact that there were "statutes all over America that required bringing guns into churches, and sometimes to other public assemblies," 1-ER-38 (emphasis omitted), as evidence that subsection (a)(22) is unconstitutional. Instead of supporting Plaintiffs' position, these laws suggest that "legislatures have long exercised significant regulatory power over firearm carry, and individuals' ability to carry firearms in houses of worship." *Goldstein*, 2023 WL 4236164, at *14. And "these requirements were not rooted in the Second Amendment's tradition." *Id*. Instead, they "required militiamen or free white men to bring their firearms to church . . . so they could defend against potential attacks by Native Americans and Blacks during slave uprisings," *id.*, which reflects a purported need for militias for collective defense under certain

23

circumstances rather than a recognition that the individual right to self-defense included the right to bring firearms into places of worship. *See Heller*, 554 U.S. at 582–583, 597 (describing the Second Amendment as "protect[ing] an individual right unconnected with militia service," contrasted with the militia's role "in repelling invasions and suppressing insurrections").

### b.   Financial Institutions (Section 26230(a)(23))

Much like government buildings, financial institutions are central to the daily functioning of American economic life and have been the target of armed robbery and terrorist activity. *See United States v. Langan*, 263 F.3d 613, 615 (6th Cir. 2001) (noting that a neo-Nazi group committed "bank robberies . . . to support their avowed purpose of committing terrorist acts"); *see* 18 U.S.C.A. § 2113(e)) (criminalizing hostage-taking during commission of a bank robbery).  The government has long recognized this reality by, among other things, requiring banks to establish minimum standards to discourage robberies, 12 U.S.C.A. § 1882, and criminalizing bank robbery on the federal level, 18 U.S.C.A. § 2113. *See United States v. Marx*, 485 F.2d 1179, 1186 (10th Cir. 1973) (federal statute was "enacted to combat the multitude of murders and kidnappings occurring during attempts by bank robbers to flee the scene of the crime").

The district court's conclusion that governments cannot restrict firearms in banks was flawed in two principal ways: (1) the district court effectively required

the Attorney General to identify a "dead ringer" for this subsection of SB 2, rather than engaging in the analogical reasoning that *Bruen* requires in circumstances involving dramatic technological change or unprecedented societal concerns; and (2) the district court relied on an unfounded theory of government-provided security as the sine qua non of a sensitive place.

First, the district court highlighted the absence of historical laws specifically restricting firearms at financial institutions. 1-ER-40. But *Bruen* does not require a historical twin for a modern statute, 597 U.S. at 30, only a relevantly similar historical analogue or analogues that fit within the nation's tradition of firearms regulation. *Id.* at 28-29.

The district court rejected the Attorney General's analogy to government buildings because those historical laws were "aimed at protecting operation of one of three branches of government." 1-ER-40. But restrictions on carrying firearms in government building such as post offices have been upheld by multiple circuits, *Bonidy*, 790 F.3d at 1125; *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009), even though one would be hard-pressed to argue that such restrictions are aimed at "protecting operation" of the executive branch. The district court also concluded that restrictions on firearms in government buildings "disarm[ed] people in spaces they were not likely to frequent in their everyday lives," 1-ER-40, but many government buildings, both historically and in the present day, are

25

frequented by ordinary people in their everyday life (e.g., the post office, the Social Security office, and Veterans' Affairs buildings). In any event, nothing in sensitive places jurisprudence suggests that the sensitivity of a place hinges on the frequency with which individuals visit it. *See Heller*, 554 U.S. at 626 (approving of sensitive places restrictions at schools, which are attended by students and teachers daily).

Finally, the district court erred in rejecting the Attorney General's analogies based on the unsupported assumption that government buildings are locations "where people stood guard at the entry to the building to ensure that no one was carrying a weapon." 1-ER-40. Many government buildings do not have any security at the door, and even paradigmatic government buildings such as legislatures historically had little security. Kopel & Greenlee, *The "Sensitive Places" Doctrine*, *supra*, at p. 235.

### 2. Certain Challenged Locations Are Sensitive because of Their Physical Nature

### a. Public Transit (Section 26230(a)(8))

California's public transportation systems have multiple characteristics that have historically justified the restriction of firearms: (a) public transit vehicles and facilities are crowded, confined spaces designed to transport large numbers of people as efficiently as possible, (b) public transit systems serve vulnerable populations, particularly children, and (c) many public transportation facilities—

such as train stations and bus stops—are owned or operated by state and local government agencies. The district court erred in rejecting these analogies.

As an initial matter, the district court did not analyze the historical analogues under a more nuanced approach, despite the fact that, as the *May* Plaintiffs' purported expert concedes—"there was no public transit" prior to 1791. 10-ER-2124. The Attorney General produced expert evidence establishing that, "[u]ntil the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers." 9-ER-1657–1658; 9-ER-1846–1847 (privately owned and operated "turnpikes, stage coaches, streets, roads, wagons, ferries, and shops of early America" are materially different from today's transit systems). The district court did not address that evidence or otherwise explain why a more nuanced approach should not apply here.

Instead, as it did with many of the other challenged provisions, the district court concluded that this provision of SB 2 was unconstitutional because it restricts the ability of "people who have been through a thorough background check and training process to obtain a permit to carry a concealed weapon" from doing so in certain locations. 1-ER-26. But, as explained above, section I.C., *supra*, that approach would make it impossible for any place-based regulation of CCW licensees to survive constitutional scrutiny.

27

The district court also erred in rejecting the Attorney General's historical analogues that regulated densely crowded spaces, schools, and government buildings, 1-ER-24–25.[4]  While the district court concluded that "spaces do not become sensitive simply because they are crowded," 1-ER-24, public transit facilities are sensitive not only because they are "crowded spaces" but also because they "serve vulnerable populations like children and disabled people," *Kipke*, 2023 WL 6381503, at *10, and are often owned or operated by the government.

The district court similarly erred in failing to recognize that "mass transit facilities are sensitive places because they are analogous to both schools and government buildings." *Kipke*, 2023 WL 6381503, at *10.  The district court asserted that children's mere presence on public transit is insufficient to show public transit's sensitivity but did not acknowledge the fact that many children use public transit to attend school.  *See* L.A. Metro, L.A. METRO'S RIDERSHIP GROWTH CONTINUES FOR 11TH CONSECUTIVE MONTH, available at http://tinyurl.com/5ckrwhpy.  The district court also missed the mark in rejecting the comparison between public transit facilities and government buildings because

---

[4] The district court appears to have adopted Plaintiffs' argument that SB 2 discriminates against low-income Californians because not "everyone has the luxury of commuting in the solitary safety of a private vehicle."  1-ER-24 (citing *May* Mot. at 10).  But none of the Plaintiffs indicated that they were forced to travel by public transit due to economic circumstances.

"historic laws protecting government buildings were aimed at essentially protecting the operation of the three branches of government." 1-ER-25. The Attorney General need only identify "relevantly similar" analogues, not dead ringers, and in any event, there is no evidence that laws protecting government buildings have been so narrowly aimed. *See United States v. Marique,* 2023 WL 5338069 (D. Md. Aug. 18, 2023), at \*4–5 (holding that the National Institute of Health campus is properly classified as a sensitive place).

The district court also mistakenly disregarded the historical rules of private railroad companies restricting firearms carry. The district court concluded that a "handful of private companies' rules do not establish an enduring American tradition of state regulation." 1-ER-26. However, the Attorney General does not conflate these "rules with laws, but use[s] them to demonstrate the general understanding during the historically relevant era." *See Jones v. Bonta*, 2023 WL 8530834 (S.D. Cal. Dec. 8, 2023), at \*10 (considering private colleges' restrictions on gun ownership and possession). In fact, these private rules reflect a contemporary understanding that firearms could be restricted on trains. The mere fact that the government rather than private companies now operates those trains cannot alter that 19th century consensus. *See Kipke*, 2023 WL 6381503, at \*10 ("[T]he Court cannot infer a lack of regulation from the absence of public

29

transportation regulations," during the 18th and 19th centuries, given that "almost all transportation was provided by private companies").

### b. Places Where Liquor Is Sold for Consumption on Site (Section 26230(a)(9))

SB 2's restriction on carry in places where liquor is sold for consumption on site finds support in three types of relevantly similar historical analogues: (a) laws prohibiting the sale of alcohol to militiamen while on duty; (b) laws restricting carry of firearms by intoxicated people; and (c) laws restricting the carrying of firearms into places where liquor was served.

In rejecting these analogues, the district court held that "there is simply no comparison between prohibiting law-abiding citizens who have completed a rigorous application process to carry a concealed weapon for self-defense" with the historical laws restricting firearms in analogous sensitive places. 1-ER-27. As explained above, section I.C, *supra*, this reasoning is inconsistent with *Bruen*.

The district court rejected the historical laws restricting intoxicated people from carrying firearms as "plainly not comparable." 1-ER-29. But the district court failed to compare the burdens and justifications of subsection (a)(9) with the historical laws identified by the Attorney General, *e.g.,* 5-ER-759–761; 5-ER-853–856; 5-ER-923–925. Indeed, the justifications are comparable (i.e., both seek to reduce the dangers of mixing alcohol and firearms) as are the burdens (i.e., subsection (a)(9) restricts firearms in particular locations but not based on level of

30

intoxication, while the historical laws restricted firearms based on level of intoxication but not location). *See Antonyuk*, 89 F.4th at 368 (finding that "intoxicated-persons analogues," when paired with statutes restricting firearms in crowded spaces, "justify regulating firearms in crowded spaces in which intoxicated persons are likely present").

Moreover, the district court incorrectly discounted the "dead ringers" and "historical twins" that the Attorney General identified: an 1853 New Mexico law prohibiting carry in balls and dances "where Liquors are sold," an 1870 San Antonio ordinance prohibiting carry in barrooms and saloons, and an 1890 Oklahoma law prohibiting carry in "any place where intoxicating liquors are sold." 1-ER-29. As the Second Circuit noted, "[t]hese analogues provide the (admittedly unnecessary) historical twins sought by the district court and demonstrate that regulating firearms based on liquor-serving places rather than intoxication is consistent with the National tradition." *Antonyuk*, 89 F.4th at 369.

The district court did not credit these laws because they were enacted in territories and localities in the latter half of the 19th century. 1-ER-29. This was error. As the Second Circuit in *Antonyuk* observed, courts should not discount territorial or municipal laws where those laws fit within a "line of the English, Founding-era, and Reconstruction state statutes," because such laws are "exactly the opposite of the few late-19th-century outlier jurisdictions offered and

31

discounted in *Bruen*." 89 F.4th 360–361 (internal quotation marks omitted). Here, this evidence fits well within a long historical tradition of regulating the mixing of alcohol and firearms. *See, e.g.,* 4-ER-719–722; 5-ER-788–789; 6-ER-990–992. Nor were these laws enacted too late to be relevant analogues. *See Bruen*, 597 U.S. at 30 (describing a review of the "historical record . . . [of] 18th- and 19th-century 'sensitive places'"); *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (finding that a "historical tradition is well-established" based on the fact that "several States enacted [analogous] laws throughout the 1800s"); *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (noting the relevance under *Bruen* of Reconstruction-era regulations).

### c. Public Gatherings and Special Events (Section 26230(a)(10))

SB 2's restriction on carry at permitted public gatherings and special events also fits within the nation's tradition of restricting firearms in these settings.

In England, beginning in the 13th century, what "constituted a 'sensitive place' in which arms bearing could be regulated and restricted . . . encompassed densely populated areas, as well as areas where people regularly congregated for lawful purposes." 7-ER-1231–1233 (noting restrictions in 1351 and 1419 that prohibited "go[ing] armed" in London); *see also* 9-ER-1641; 10-ER-1889; 4-ER-535–539 (prohibiting bringing "force in affray of the peace, nor [going] nor

rid[ing] armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers").

Historical evidence "unequivocally" demonstrates "that armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States."  7-ER-1233; *see also* 9-ER-1641–44; 10-ER-1889–90.  In fact, around the time of the Founding, two jurisdictions—Virginia and North Carolina—expressly enacted or retained their own versions of the Statute of Northampton that were understood to impose restrictions on carrying weapons at public gatherings.  4-ER-637–638; 4-ER-642–645.

When jurisdictions in the United States began enacting more location-specific restrictions in the 19th century, it was common for these laws to prohibit weapons at large gatherings that were open to the public.  7-ER-1234–1236; 10-ER-1890–1893; 4-ER-681–682; 4-ER-717–718.  Exemplary of this trend is an 1870 Texas law that prohibited going armed in all places of gatherings or assemblies, such as:

> any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, . . . or *to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly[.]*

5-ER-790–793 (emphasis added); *see also* 9-ER-1644–1653 (discussing the 1870 Texas law and its subsequent iterations).  Numerous other states and territories passed similar prohibitions, which also contained broader restrictions on firearms

33

at public assemblies. *See, e.g.,* 5-ER-772–775 (any "other public assembly of the people"); 5-ER-778–781 ("any other public gathering in this State"); 5-ER-829–830 ("into any other public assemblage of persons met for any lawful purpose [other than militia mustering]"); 5-ER-867–868 (same); 6-ER-979-982 ("any other public assembly"); 6-ER-1042–1044 (same); 6-ER-1146–1149 ("any public assembly").

Local ordinances similarly restricted the carrying of firearms at public assemblies and gatherings. *See* 7-ER-1236–1243; 9-ER-1641–1644, 9-ER-1651–1653; *see also, e.g.,* 6-ER-990–992 (at "any other public assemblage of persons met for any lawful purpose"); 4-ER-661–662 (forbidding weapons in public ballrooms).

Judicial opinions upholding these laws conveyed the consensus that governments could constitutionally restrict firearms at public gatherings. *See Andrews*, 50 Tenn. at 182 ("[A] man may well be prohibited from carrying his arms to church, or other public assemblage."); *Hill*, 53 Ga. at 476 ("[T]he bearing of arms of any sort [at concerts] is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners."); *Owens v. State*, 3 Tex. App. 404, 406 (1878) (affirming conviction for carrying a pistol into a public social gathering under Texas statute); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding

34

conviction under statute prohibiting carrying firearm to any place "where people are assembled for educational, literary, or social purposes"); *Alexander*, 27 Tex. App. at 537 (affirming conviction under statute prohibiting carrying weapons "into an assembly of people"); *Maupin v. State*, 17 S.W. 1038, 1039 (Tenn. 1890) (affirming conviction for carrying firearm at a mill, which was "a public . . . place to which customers were constantly invited and daily expected to go"); *State v. Pigg*, 85 Mo. App. 399, 402 (1900) (affirming conviction for carrying firearm at an in-home public social gathering); *Wynne v. State*, 51 S.E. 636, 637 (Ga. 1905) (affirming conviction for carrying firearm at a Fourth of July barbeque at which hundreds of people were assembled).  These laws were upheld even in the face of arguments that carrying firearms in large gatherings would be necessary for self-defense.  *See e.g.*, *Alexander*, 27 Tex. App. at 537; *Brooks v. State*, 15 Tex. App. 88, 90 (1883); *Maupin*, 17 S.W. at 1039; *see also* 7-ER-1244; 10-ER-1896–1897.

The district court erred in discounting the 19th century laws identified by the Attorney General.  As explained above, both the Supreme Court and this Court have recognized the relevance of 19th century laws in determining whether a law fits within the Nation's tradition of firearms regulation.  *See supra* at section I.C.2.b.  The district court also erroneously concluded that the historical analogues the Attorney General identified were "not relevantly similar" to subsection (a)(10) given that "SB 2 prohibits trained and vetted CCW permitholders from carrying

firearms," whereas the historical analogues did not.  *See supra* at section I.C

(describing the absence of permitting requirements in the 18th and 19th centuries).

Finally, the district court incorrectly described the "cited analogues" as

merely "prohibit[ing] firearms at public gatherings like balls and fandangos for

entertainment and amusement."  1-ER-31.  As set forth above, however, these

historical laws used broad language restricting firearms carry both at specified

locations and at *any other public assembly*, *see supra*, section I.C.2.c.  In that

sense, notwithstanding the fact that requiring permits for certain public events is a

modern phenomenon, SB 2 is less burdensome than its historical predecessors

because it applies only to public gatherings and special events that require a

permit.

### d.    Casinos, Stadiums, and Amusement Parks (Sections 26230(a)(15), (a)(16), and (a)(19))

SB 2's restrictions on carry at casinos, stadiums, and amusement parks are

also constitutional, particularly in light of the Attorney General's expert evidence

showing that these places did not exist in their modern form in the Founding or

Reconstruction eras.  *See* 10-ER-1893–1894; 7-ER-1208–1209; 8-ER-1542–1545.

The district court concluded that the historical analogues "do not reflect a

well-established, representative historical tradition of preventing vetted and trained

permitholders from carrying firearms for self-defense in casinos, stadiums, arenas,

amusement parks, or similar locations."  1-ER-36.  But, as explained above, *see*

36

*supra*, section I.C, such licensing requirements did not exist until the 20th century, and thus no historical statutes from the 18th or 19th century restricted such persons from carrying firearms in casinos, stadiums, or amusement parks (or any other location for that matter). Moreover, as the Attorney General's experts made clear, these locations did not exist in their modern form during the Founding or Reconstruction era, meaning that the district court should have applied a nuanced approach to the historical analogues.

The district court also failed to address most of the relevantly similar historical analogues proffered by the Attorney General. While the district court addressed four laws—a 1786 Virginia law, an 1816 New Orleans law, an 1853 New Mexico law, and an 1882 New Orleans law, 1-ER-36—the Attorney General also cited numerous other Reconstruction-era laws banning firearms in various entertainment venues. *See, e.g.*, 5-ER-790–793 ("into a ball room, social party or other social gathering composed of ladies and gentlemen"); 5-ER-772–775 ("race course"); 6-ER-979–982 ("place where persons are assembled for amusement . . . or into any circus, show or public exhibition of any kind"); 6-ER-1042–1044 (similar); 6-ER-1150–1153 (similar).

**3.    Certain Challenged Locations Are Sensitive Because of the Vulnerable People Who Congregate There**

**a.    Health Care Facilities (Section 26230(a)(7))**

Section 26230(a)(7)'s restriction on carrying firearms in healthcare facilities falls squarely within the Nation's historical tradition of prohibiting the carry of firearms in locations which serve a "scientific purpose" of administering medical treatment. *See, e.g.,* 5-ER-799–802; 6-ER-977–978; 6-ER-990–992; 6-ER-1143–1145. Moreover, "health care facilities . . . serve a vulnerable population, and their regulation is justified by the protection of that population." *Kipke*, 2023 WL 6381503, at *8.

The district court's contrary conclusion is an abuse of discretion for several reasons. First, for the reasons explained above, *see supra*, section I.C, the district court made the same foundational error it did elsewhere in its opinion, holding that subsection (a)(7) "impermissibly denies the core Second Amendment right to . . . people . . . who have gone through a lengthy permit application process including a thorough background check and safety and training course." 1-ER-19–20; *see also* 1-ER-21 (similar).

Second, the district court erred in requiring the Attorney General to identify an exact historical analogue that restricted firearms carry in health care facilities. *See Antonyuk*, 89 F.4th at 341 (admonishing district court for effectively requiring a "dead ringer"). As shown by two leading historians of American medical

38

facilities, 7-ER-1386–1406 and 8-ER-1509–1534, health care facilities have

undergone "dramatic technological changes" since the Founding and

Reconstruction eras. *Bruen*, 597 U.S. at 27. As the *May* Plaintiffs' own purported

expert concedes, hospitals were "rare" at the time of the Founding (10-ER-2127),

and the few hospitals that did exist were not the technologically advanced "medical

workplaces" that exist today. 7-ER-1392; *see also Md. Shall Issue, Inc.,* 2023 WL

4373260, at *14 (only in late 19th century, as medical practices grew in

sophistication and complexity, was there "a shift in the norm of medical practice at

home to . . . medical services that increasingly took place in hospitals'"). But

having ignored the fact that "hospitals did not exist in their modern form at the

time of the ratification of the Second or Fourteenth Amendments," *Kipke*, 2023

WL 6381503, at *8 (internal quotation marks omitted), the district court failed to

credit expert evidence showing that Founding-era laws expressly prohibiting

firearms in hospitals were unnecessary because the patient population of those

hospitals could not afford firearms in the first place, 7-ER-1393.

     Third, the district court abused its discretion in determining that the Attorney

General's proffered analogues were not "relevantly similar" to SB 2's restrictions

on carry in health care facilities. The Attorney General identified numerous

"relevantly similar" historical analogues restricting the carry of firearms into

places where people assembled for "educational" or "scientific" purposes, but the

district court nevertheless concluded that the "government provides no evidence that the proffered analogies . . . are well-established, representative, or consistent with a tradition of banning firearms in places like hospitals."  1-ER-23.  But the Attorney General is "not required to show that firearms were traditionally banned "in places such as 'almshouses,' hospitals, or physician's offices."  *Antonyuk*, 89 F.4th at 341.  Rather, the numerous statutes identified by the Attorney General are relevantly similar historical laws restricting firearms in analogous places, and thus satisfy the Attorney General's burden at stage two of the *Bruen* analysis.

Fourth, the district court did not properly consider the analogy to historical regulations protecting places like schools where vulnerable populations gather.  SB 2's restrictions on firearms in health care facilities fit "within this Nation's tradition of firearm regulation in locations where vulnerable populations are present."  *Antonyuk*, 89 F.4th at 339–342 (finding plaintiffs unlikely to succeed on the merits on their challenge to firearms in mental health facilities); *see also We The Patriots, Inc. v. Grisham*, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), at *11 (concluding that what constitutes a sensitive place can be determined by "whether a vulnerable population" uses that location).

### b.    Playgrounds and Youth Centers (Section 26230(a)(11))

SB 2's restriction on carry at playgrounds and youth centers also comports with the Second Amendment.  Declarations from leading historians established that

40

these places did not exist in their modern form at either the Founding or Reconstruction, *see* 7-ER-1208–1211; 7-ER-1437–1438, which means that the district court should have applied a nuanced analogical approach. Several other courts have applied that nuanced approach and have upheld similar restrictions based on relevantly similar historical analogues. *See Antonyuk*, 639 F. Supp. 3d at 324 (refusing to enjoin restrictions on firearms at public playgrounds);[5] *Koons*, 2023 WL 3478604, at *82 (refusing to enjoin a law banning "firearms at playgrounds"); *We the Patriots USA, Inc. v. Grisham*, 2023 WL 6377288 (D.N.M. Sept. 29, 2023), at *3 ("Plaintiffs are unable to show a substantial likelihood of success on the merits in their constitutional challenge . . . as it relates to playgrounds and other areas where children play.").

Restrictions on firearms at playgrounds and youth centers find support in analogous restrictions on firearms at schools. *See Heller*, 554 U.S. at 626 (noting constitutionality of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"); *United States v. Walter*, 2023 WL 3020321 (D.V.I. Apr. 20, 2023), at *7–8 (affirming constitutionality of federal ban on possession of a firearm in school zones). "[B]y their very nature, both places

---

[5] The district's court determination on firearms in playgrounds was not appealed, thus was not on review in the Second Circuit appeal. *See Antonyuk*, 89 F.4th at 354 n.70.

often contain children." *Antonyuk*, 639 F. Supp. 3d at 324. And such restrictions should be considered under a "more nuanced approach" because playgrounds and other non-school settings where children gather to play and learn emerged alongside modern parks only in late 19th and early 20th centuries. *See* 7-ER-1437–1439; 10-ER-1968–1969.

The district court rejected this evidence and authority, however, opining that "regulating firearms at schools is different than playgrounds and youth centers in key ways" because parents "deliver[] children to the state (sometimes with armed officers) for protection" at schools. 1-ER-32. But there is no evidence in the record to suggest that schools are a more secure location than youth centers (where adults without children attending would also presumably be unwelcome). And in general, "adults (at least when they are not supervising children) do not frequent playgrounds as much as children do." *Antonyuk*, 639 F. Supp. 3d at 324. Historical analogues prohibiting firearms in schools are thus relevantly similar to the restriction challenged here. *Id.*

### c.    Parks and Athletic Facilities (Sections 26230(a)(12), (a)(13))

Nor are Plaintiffs likely to succeed on the merits of their challenge to SB 2's restrictions on carry in local parks and athletic facilities (26230(a)(12)) and in state parks (*id*. at (a)(13)).

42

Public parks that resemble modern parks only began to emerge in the middle of the 19th century, 10-ER-1957, 1962–1963; 7-ER-1414. New York City's Central Park became the first such space in the mid-19th century. 10-ER-1961–62. Before the 19th century ended, America's best-known urban parks had appeared. 10-ER-1962. Many of these parks "swiftly promulgated similar prohibitions concerning the carrying of firearms . . . because they shared a common purpose— the improvement of American society." 10-ER-1966–70 (collecting park regulations prohibiting the carrying of firearms in Central Park, Brooklyn's Prospect Park, and San Francisco's Golden Gate Park, among other parks); *see also Kipke*, 2023 WL 6381503, at *10 ("The historical record further shows that as States and cities created more parks, they also imposed firearm regulations.").

By 1900, the carrying of firearms was prohibited in more than two dozen parks across at least ten different states. *See* 10-ER-1966–1970. Once the park movement took hold on the national level, Yellowstone National Park banned firearms in 1897. 6-ER-1121–1124; *see also* 7-ER-1420–1421 (explaining influence of park movement on national level). And firearms were banned from all national parks in 1936, *see* 6-ER-1178–1179, a ban that was in place for more than

43

70 years.  Similarly, once the state park movement took hold, firearm bans were enacted in many state parks, including California's.  7-ER-1431–1432.[6]

The district court mistakenly concluded that these myriad historical analogues were not "well-established, representative, or consistent with a national tradition of prohibiting firearms in all public parks as SB 2 does."  1-ER-34.  New York's restriction on firearms in Central Park, for example, was effectively a ban on firearms on all public parks in the jurisdiction, given that Central Park was the only public park in the city at the time.  10-ER-1962, 1966.  And many of the bans on firearms carry in state parks applied to *all* state parks within a particular state.  *See, e.g.,* 3-ER-240 (Alabama regulation providing that "Fire-arms are rigidly excluded from State Parks"); 3-ER-248 (Arkansas regulation providing that "No firearms shall be possessed or carried within the boundaries of a state park . . . .").  These regulations are indeed representative of "a national tradition of prohibiting firearms in all public parks as SB 2 does," 1-ER-34.

The district court cited other district court opinions for the proposition that the number of regulations on urban parks is insufficient for the Attorney General to carry his burden at stage two of the *Bruen* analysis.  1-ER-34 (quoting *Siegel v.*

---

[6] The Attorney General is unaware of any case challenging these regulations as unconstitutional, and Plaintiffs have not pointed to any "disputes regarding the lawfulness of such prohibitions" (or any other relevantly similar historical analogues that the Attorney General put forth).  *See Bruen*, 597 U.S. at 30.

44

*Platkin*, 653 F. Supp. 3d 136, 153 (D.N.J. 2023), for the proposition that "[s]ix cities do not speak for, what was by 1893, 44 states"); *id.* (quoting *Koons*, 2023 WL 3478604, at *85, for the proposition that "one state law and about 25 local ordinances governed less than 10% of the nation's entire population and thus are unrepresentative).[7]   Unlike in *Siegel*, the Attorney General identified carry restrictions in more than two dozen parks across at least ten different states.  *See* 10-ER-1966–70.  And unlike in *Koons*, the Attorney General identified numerous state laws that restricted the carry of firearms in all state parks.  3-ER-236–397 (Alabama, Arkansas, California, Connecticut, Florida, Indiana, and Kansas, among others).

Nor does *Bruen* suggest that a court should calculate the percentage of the population subject to a particular regulation at a point in time in order to determine the constitutionality of that regulation.  As the Second Circuit observed, "the number of people subject to a given law is only one clue to whether said law may have been an outlier unable to refute a contrary tradition."  *Antonyuk*, 89 4.th at 321; *id.* at 339 ("Disqualifying proffered analogues based only on strict quantitative measures such as population size absent any other indication of

---

[7] The district court's decisions enjoining these restrictions in both *Koons* and *Siegel* have been stayed by the Third Circuit.  *See May* 9th Cir. Dkt. 5 (Meyerhoff Decl., Ex. 3); *Carralero* 9th Cir. Dkt. 5 (same).

historical deviation would turn *Bruen* into the very 'regulatory straightjacket' the Court warned against."). This is particularly true in the sensitive places context, given the Supreme Court's conclusion that firearms at legislative assemblies and polling places can be constitutionally restricted despite the fact that only one of the thirteen colonies restricted firearms at each location (Maryland and Delaware, respectively), and those jurisdictions at the time of the first census represented only 8.1% and 1.5% of the nation respectively, United States Census Bureau, RETURN OF THE WHOLE NUMBER OF PERSONS WITHIN THE SEVERAL DISTRICTS OF THE UNITED STATES (1791), available at http://tinyurl.com/myk86bsk. *See United States v. Allam*, 2023 WL 5846534 (E.D. Tex. June 14, 2023), at *25 ("*Bruen* noted that, in the context of sensitive place prohibitions, 'the historical record yields relatively few' of these historical precursors," yet "[n]onetheless, *Bruen* seemed to view these few precursors to be compelling.").

The district court also incorrectly rejected the Attorney General's comparison of parks and athletic facilities to schools. 1-ER-35. Like parks and athletic facilities, schools are frequented by both adults and children: they have teachers, administrators, and janitors who work in the school building on a daily basis, and often open their doors to adults for performances, athletic events, and evening and weekend programming. Yet no current member of the Supreme Court has questioned the validity of restrictions on firearms in schools.

46

### d.    Public Libraries, Zoos, and Museums (Section 26230(a)(17), (a)(20))

Libraries, museums, and zoos did not exist in their modern form during the Founding or Reconstruction eras, 7-ER-1411, 1434–1435; 7-ER-1207–1208; 8-ER-1482, and California's restrictions on firearms within those locations fall naturally within the Nation's historical tradition of regulating firearms in places of gathering for "literary," "educational," or "scientific purposes," *see supra*, section I.B (collecting laws regulating firearms at places with those purposes), especially where those places tend to be crowded or filled with children.

In reaching a contrary conclusion, the district court made three main errors. First, the district court rejected the relevantly similar historical analogues identified by the Attorney General because none of those laws "prevent[ed] people with special permits who have been through background checks and training from carrying firearms . . . at libraries, zoos, or museums." 1-ER-37. That was incorrect. *See supra* at I.C.

Second, the district court concluded that the Attorney General's historical analogues are not "relevantly similar" because "SB 2 imposes a far greater burden on the right to self-defense than the proffered historical analogues with non-comparable justifications." 1-ER-37. But the district court does not explain what "far greater burden" SB 2 imposes, or why the historical analogues do not have comparable justifications. In fact, the burdens are the same (i.e., a ban on firearms

47

carry in the places in question), as are the justifications (i.e., allowing people to gather for educational activities without fear of firearms-related violence). *Antonyuk*, 89 F.4th at 363 (finding that the nation's "well-established and representative tradition of regulating firearms in densely trafficked public forums" supports the constitutionality of firearms restrictions in zoos).

Third, the district court erroneously rejected historical analogues restricting carry in schools based on the theory that "[a]dults also frequent public libraries, zoos, and schools, and when children are present in those places, adults remain responsible for their safety." 1-ER-37–38. As explained above, *see supra*, section I.C.3.c, the mere fact that adults are present does not disprove that those places are analogous to schools. *See* National Center for Education Statistics, Fast Facts, available at http://tinyurl.com/yk7r4jr9 (in the 2021-22 school year, there were 3.7 million full-time teachers in American public and private schools); *see also Antonyuk*, 89 F.4th at 363 (in light of the fact that "70 percent of zoo visitors come accompanied by children," the "tradition of prohibiting firearms in places frequented by children straightforwardly supports the regulation of firearms in zoos"). Thus, prohibiting firearms in public libraries, schools, and museums "is consistent with the country's tradition of regulating firearms in places of educational and scientific opportunity, places heavily trafficked by children, and places that are densely crowded." *Id*. at 364.

48

### 4. Plaintiffs Are Unlikely to Succeed on the Merits of Their Challenges to the Parking Lot Provisions

The district court abused its discretion in issuing a sweeping, unprecedented injunction as to SB 2's restrictions on concealed carry in the parking lots of all of the sensitive places listed in SB 2 (including even those where Plaintiffs did not assert they would be harmed by such a provision).

The Attorney General identified relevantly similar historical analogues to SB 2's restrictions on firearms in the parking lots of certain sensitive places, 4-ER-623–626 (outlawing "any 'battalion or company' from coming within a mile of a polling place for twenty-four hours before or after the election"); 5-ER-782–787 (banning "any dangerous weapon, concealed or unconcealed, on any day of election . . . or registration . . . within a distance of one-half mile of any place of registration"). Moreover, numerous cases have upheld sensitive places restrictions that specifically included parking lots. *See Bonidy*, 790 F.3d at 1125 (concluding that "the parking lot should be considered as a single unit with the postal building itself to which it is attached and which it exclusively serves"); *Dorosan*, 350 F. App'x at 875 (parking lot used by the Postal Service "falls under the 'sensitive places' exception recognized by *Heller*"); *Allam*, 2023 WL 5846534, at *23 ("[T]his Nation is no stranger to prohibiting individuals from possessing or carrying firearms . . . within a certain proximity of sensitive places."); *see also Walter*, 2023 WL 3020321, at *7 ("Not only is there historical evidence of

49

regulation on firearms in sensitive places, but there is also evidence of laws creating 'buffer zones' around those places as well."); *Md. Shall Issue*, 2023 WL 4373260, at *13 (finding "numerous examples of laws prohibiting firearms in buffer zones of a certain distance around a 'sensitive place'").

Further, the district court erred in enjoining *all* parking lot restrictions, even those restrictions that Plaintiffs never asserted would harm them: on firearms in parking lots of preschool or childcare facilities (Section 26230(a)(2)), buildings under the control of an officer of the executive or legislative branch of the state government ((a)(3)), buildings designated for court proceedings ((a)(4)), prisons and jails ((a)(6)), colleges and universities ((a)(14)), airports ((a)(18)), nuclear sites ((a)(21)), police stations ((a)(24)), and polling places ((a)(25)). "[A]n injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (internal quotation marks omitted); *see United States v. BNS Inc.*, 858 F.2d 456, 466 (9th Cir. 1988) (modifying injunction to narrow its scope). In this case, Plaintiffs have not alleged, much less established, that they are harmed by SB 2's restrictions on the carry of firearms in these locations, and thus the injunction on enforcement on those restrictions should be vacated.

Indeed, the district court appeared to reject the notion that a parking lot or buffer zone could ever be constitutionally permissible: "SB2's designation of parking areas as sensitive places is inconsistent with the Second Amendment," given that "[b]oth *Heller* and *McDonald* describe sensitive places where carry may be prohibited using the preposition 'in,' not 'near' or 'around.'" 1-ER-44. As noted, other courts have properly rejected the argument that buffer zone restrictions are per se unconstitutional, and such a rule would make little sense given that "the same security interests which permit regulation of firearms 'in'" sensitive places should "permit regulation of firearms on the property surrounding those" places. *See United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019).[8]

## II.   SB 2's PRIVATE PROPERTY PROVISION (SECTION 26230(A)(26)) IS CONSTITUTIONAL

The district court also erred in concluding that Plaintiffs were likely to succeed on their challenge to subsection (a)(26), the provision of SB 2 that restricts carry on private commercial property without the operator's express consent.

At stage one of the *Bruen* analysis, Plaintiffs' proposed course of conduct in carrying firearms onto private property without the operator's express consent does

---

[8] Adopting such a per se rule is particularly flawed in this case, given that SB 2 permits a CCW licensee to bring a firearm into such parking lots so long as the firearm is "within [a] . . . vehicle" and "locked in a lock box," except in the parking lots of nuclear facilities or where such conduct would be prohibited by federal law. Cal. Penal Code § 26230(c)(1).

not implicate the plain text of the Second Amendment. *See Bruen*, 597 U.S. at 24 (plaintiffs must show that "the Second Amendment's plain text covers an individual's conduct"). The district court erred in concluding otherwise.

In *Bruen*, the Court clarified "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*." 597 U.S. at 10 (emphasis added). However, the Court did not announce a right to carry in all places outside the home, including others' private property. *Id*. at 53 ("history reveals a consensus that States could not ban public carry *altogether*") (emphasis altered). The indisputable constitutionality of restrictions on carrying in public spaces like courthouses and other government buildings makes clear that the plain text of the Amendment does not cover the bearing of arms in every place open to the public, *Bruen*, 597 U.S. at 30, and reinforces the fact that the Second Amendment right is at its apex in "the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628–29.

The district court erred in concluding that Plaintiffs have "the presumption of the right to carry a firearm on private property held open to the public." 1-ER-37 (quotation omitted). Plaintiffs have no "right," presumptive or otherwise, to carry firearms onto others' private property, and any claim of a "'constitutional' right to bear arms [in a private business] must be read to include rights that arise not under the state or federal Constitution" because "a private business's banning of guns on

its own property plainly is not unconstitutional." *See Fla. Retail Fed'n, Inc. v. Att'y Gen. of Fla.*, 576 F. Supp. 2d 1281, 1295 & n.7 (N.D. Fla. 2008).[9]

Put simply, "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634–635, and a right to carry firearms on others' private property was not within the scope of the Second Amendment when it was adopted. The Second Amendment did not "in any way abrogate[] the well established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle," and did not "not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. 1; *see also Hoven v. Walgreen Co.*, 751 F.3d 778, 784 (6th Cir. 2014) (the Second Amendment does "not prevent interference . . . by private actors"); *W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*, 2023 WL

---

[9] In *Wolford*, the district court held that a restriction similar to Section 26230(a)(26) likely violated the Second Amendment because conduct "that was presumptively protected under the Second Amendment is now presumptively not protected." 2023 WL 5043805, at *27. But this conclusion reflects the same misunderstanding that the district court had in this case—namely, that the Second Amendment includes a right to carry firearms on someone else's private land. This erroneous conclusion has been adopted by other courts to consider the issue, *see, e.g., Antonyuk*, 89 F.4th at 383; *Koons*, 2023 WL 3478604, at *56, but should not be adopted by this Court.

53

5659040 (S.D.W. Va. Aug. 31, 2023), at *7 ("[N]o court has recognized a right [to bear Arms] against *private* encumbrances.").

Moreover, Plaintiffs are also unlikely to succeed because the state action that their claim requires is absent here. "Only the state, or an individual acting in an official capacity, can violate individual constitutional rights" because the "Constitution secures rights and protections for the individual against government action." *Jarvis v. Vill. Gun Shop*, 53 F. Supp. 3d 426, 431 (D. Mass. 2014) (rejecting a Second Amendment claim against a privately owned gun shop), *aff'd*, 805 F.3d 1 (1st Cir. 2015). Under Section 26230(a)(26), it is the property owner, not the State, that determines whether concealed firearms can be carried onto their property.

Even if the private property provision implicated the Second Amendment's plain text, the Attorney General has identified numerous relevantly similar historical analogues at stage two of the *Bruen* analysis:

- 4-ER-575–580 (1721 Pennsylvania law making it a criminal offense to "carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation")

- 4-ER-581–858 (1722 New Jersey law providing for criminal penalties "if any Person or Persons shall presume . . . to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own, unless he have License of Permission from the Owner of such Lands or Plantation")

54

- 4-ER-607–611 (1763 New York law establishing criminal liability for persons who, among other things, carry "Musket, Fowling-Piece, or other Fire-arm whatsoever, into, upon, or through any . . . inclosed Land whatever . . . without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor . . .")

- 4-ER-612–619 (1771 New Jersey update to its statute, both simplifying its language and broadening its reach, and providing for penalties for persons who "carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in writing from the Owner or Owners or legal Possessor")

- 5-ER-743–749 (1865 Louisiana law prohibiting "the carrying of fire-arms on premises or plantations of any citizen," without the consent of the owner)

- 5-ER-754–758 (1866 Texas law providing that "[i]t shall not be lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor")

- 6-ER-1045–1056 (1893 Oregon law making it unlawful to be "armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof")

The district court discounted these analogues, positing that "at least three of the proffered analogues were designed to "deter[] unlicensed hunting," and thus have different justifications than subsection (a)(26).  1-ER-42 (quoting the vacated district court opinion in *Antonyuk*).  But, as the plain language of the statutes above makes clear, they were not limited to the protection of wildlife or deterring poaching.  And even if the district court were correct on that point, that would do nothing to discount the other four relevantly similar historical statutes identified by the Attorney General.

55

The district court similarly erred when it concluded that these statutes applied only to private lands not open to the public.  1-ER-42.  Nothing in these statutes supports that conclusion—indeed, the 19th century statutes refer to "premises" generally, and the 18th century laws refer to "any" lands.  The district court identified no evidence to support its atextual reading of the statutes.

In addition, although the district court did not reach the issue, Plaintiffs are also unlikely to succeed on their First Amendment claim that Section 26230(a)(26) unconstitutionally compels their speech.

First, Plaintiffs lack standing to assert their First Amendment claim because there is no threat that they will suffer an injury-in-fact.  To satisfy the Article III standing requirement, a plaintiff must show that he "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  The only Plaintiffs who could even potentially have standing to bring these claims are those two who operate businesses, 11-ER-2178–2180.  But those two Plaintiffs have not established any injury deriving from a denial of their First Amendment rights because Section 26230(a)(26) imposes no civil or criminal penalties on "the operator" of a privately owned establishment for posting or failing to the post "a sign at the entrance of their premises," so there is

56

no threat of "concrete and particularized" injury, much less one that is "actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

Second, Plaintiffs are unlikely to succeed on their First Amendment claim on the merits because Section 26230(a)(26) does not compel them to speak. If Plaintiffs do nothing, they will not face any criminal or civil punishment. And if Plaintiffs post signage stating that concealed firearms are permitted in their business, they will suffer no criminal or civil punishment. To be clear, Plaintiffs are not even left with that binary choice. They could post the signage contemplated under the statute (or not) and also express (through signage or otherwise) any other message conveying their beliefs about SB 2, firearms in general, or virtually anything else. In other words, the law neither compels speech nor restricts it, *cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 627–629 (1943) (resolution required students to repeat the pledge of allegiance or face expulsion), and thus does not violate the First Amendment.[10]

---

[10] Plaintiffs also assert that SB 2 violates due process because it does not require proprietors of restricted location to post notices that firearms are prohibited. 11-ER-2206–2207. But they are unlikely to succeed on this claim, because, to state a due process claim, they must show that there is a "risk that individuals will not be put on notice by the text of the Challenged Provision, or that the wording of the law would encourage arbitrary enforcement." *Goldstein*, 2023 WL 4236164, at *18.

### III. THE OTHER PRELIMINARY INJUNCTION FACTORS DO NOT SUPPORT THE DISTRICT COURT'S INJUNCTION

The district erred in its balancing of the other preliminary injunction factors. As an initial matter, the "public interest" is harmed where, as here, a lower court invalidates and enjoins a duly enacted statute. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And as this Court has recognized, a State necessarily "suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997). Moreover, sensitive places regulations further the "public's interest in preventing gun violence," which remains an important concern in weighing the equitable factors for an injunction even after *Bruen*. *Kipke*, 2023 WL 6381503, at *17. And as Chief Justice Roberts has recognized, barring a State from enforcing "a duly enacted statute to help prevent these injuries constitutes irreparable harm." *Maryland*, 567 U.S. at 1303; *see also Duncan v. Bonta*, 83 F.4th 803, 806 (9th Cir. 2023) (en banc).

The balance of harms also weighs against a preliminary injunction. If the injunction is not vacated, tens of millions of Californians will face a heightened risk of gun violence in places where their children congregate and where they go to exercise their constitutional rights. And that, in turn, increases the risk of "'otherwise avoidable human suffering'" if the carry of firearms in sensitive places

58

leads to an avoidable shooting.  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009).

According to the district court, "CCW permitholders are not the gun wielders legislators should fear," 1-ER-48, because permittees have only been responsible for a few deaths in California in recent memory.  *Id*.  But SB 2's sensitive places restrictions result from a legislative determination not just that allowing individuals to carry firearms in sensitive places will lead to increased violence, but also to the suppression of other constitutional rights, such as the right to worship and peaceably assemble.  *See* SB 2 (2023–2024 Reg. Sess.), § 1(a).  And SB 2's new, shall-issue regime will likely lead to an expansion of the persons permitted to carry concealed weapons, rendering experience under the now defunct "good cause" requirement of limited value in predicting future outcomes in the absence of that requirement.

The district court acknowledged that "the government may have some valid safety concerns," but nonetheless reasoned that restricting carry by CCW licensees "seems an odd and misguided place to focus to address those safety concerns."  1-ER-47.  The district court's reasoning ignores the fact that those without licenses are already restricted from carrying firearms into all of the places restricted by SB 2 (Penal Code section 25850), and thus the State is not singling out CCW licensees.  Instead, it is merely declaring that firearms cannot be carried by any

59

private citizens, licensees or otherwise, in certain sensitive places—a policy choice that, as explained above, is consistent with the Second Amendment.

In the district court's view, "SB2 requires that law-abiding citizens open themselves up for slaughter at the hands of people flaunting the law and creates numerous areas ripe for mass murder." 1-ER-48. But the district court's disagreement with SB 2 as a policy matter does not permit it to strike down the statute. *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) (the Second Amendment is not "a regulatory straightjacket," but rather "allows a variety of gun regulations") (cleaned up).

## CONCLUSION

The district court's decision granting a preliminary injunction should be reversed.

Dated:  January 19, 2024                Respectfully submitted,

                                        ROB BONTA
                                        *Attorney General of California*
                                        THOMAS S. PATTERSON
                                        *Senior Assistant Attorney General*
                                        R. MATTHEW WISE
                                        MARK R. BECKINGTON
                                        *Supervising Deputy Attorneys General*

                                        s/ Robert L. Meyerhoff
                                        ROBERT L. MEYERHOFF
                                        *Deputy Attorney General*
                                        *Attorneys for Defendant-Appellant*

60

## STATEMENT OF RELATED CASES

The Attorney General is aware of the following related cases:

- *Wolford v. Lopez*, 9th Cir. No. 23-16164: Appeal from a preliminary injunction order enjoining certain provisions of Hawai'i's Act 52, which prohibits carrying or possessing firearms in specified locations and premises.

Dated:  January 19, 2024                                     s/ Robert L. Meyerhoff

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-4354 and 23-4356

I am the attorney or self-represented party.

**This brief contains** | 13,834 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Robert L. Meyerhoff | **Date** | January 19, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*