Nos. 23-4354 and 23-4356

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARCO ANTONIO CARRALERO, ET AL.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF CALIFORNIA,
*Defendant-Appellant*.

**On Appeal from the United States District Court
for the Central District of California**
No. 8:23-cv-01798-MRA-ADSx
The Honorable Mónica Ramírez Almadani, Judge

## APPELLANT'S SUPPLEMENTAL BRIEF

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
MARK R. BECKINGTON
*Supervising Deputy Attorneys General*

ROBERT L. MEYERHOFF
TODD GRABARSKY
JANE REILLEY
LISA PLANK
CAROLYN DOWNS
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
(213) 269-6177
Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta as Attorney General of the State of California*

July 12, 2024

(*Additional caption appears on next page*)

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RENO MAY, ET AL.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF CALIFORNIA,
*Defendant-Appellant*.

**On Appeal from the United States District Court
for the Central District of California**
No. 8:23-cv-01696-MRA-ADSx
The Honorable Mónica Ramírez Almadani, Judge

## TABLE OF CONTENTS

Page

Introduction .................................................................................................. 1

Argument .................................................................................................... 1

    I.    *Rahimi*'s Guidance About the Methodological Approach to the Second Amendment Analysis ........................................... 1

    II.   *Rahimi* Supports the Attorney General's Arguments for Reversal ................................................................................... 4

        A.   *Rahimi* reaffirms that sensitive places restrictions in schools and government buildings are permissible and support analogous restrictions .............. 4

        B.   *Rahimi* supports the Attorney General's methodological approach and rejects Plaintiffs' analysis ................................................................................ 6

            1.   The government need only show consistency with principles that underpin a regulatory tradition .............................................. 6

            2.   The government may rely on a broad range of historical evidence .......................................... 9

            3.   The government need not identify a certain quota of historical analogues ............................. 11

        C.   *Rahimi*'s application of the historical analysis demonstrates why reversal is warranted here ............... 13

Conclusion ............................................................................................... 15

i

# TABLE OF AUTHORITIES

Page

**CASES**

*Antonyuk v. Chiumento*
  89 F.4th 271 (2d Cir. 2023) ...................................................... 8, 11, 12, 13

*District of Columbia v. Heller*
  554 U.S. 570 (2008).............................................................................. 4, 5

*McDonald v. Chicago*
  561 U.S. 742 (2010)....................................................................................5

*New York State Rifle & Pistol Assn., Inc. v. Bruen*
  597 U.S. 1 (2022)............................................................................. *passim*

*Tyler v. Cain*
  533 U.S. 656 (2001)....................................................................................8

*United States v. Duarte*
  101 F.4th 657 (9th Cir. 2024) ................................................................ 5, 6

*United States v. Rahimi*
  No. 22-915 (U.S. June 21, 2024)..................................................... *passim*

**STATUTES**

18 U.S.C. § 922(g)(8)(C)(i) ............................................................................1

**CONSTITUTIONAL PROVISIONS**

Second Amendment............................................................................ *passim*

# INTRODUCTION

In *United States v. Rahimi*, No. 22-915 (U.S. June 21, 2024), the Supreme Court in an 8-1 decision rejected a Second Amendment challenge to a statute that prohibits individuals subject to certain domestic violence restraining orders from possessing a firearm. In upholding the law, the Court reiterated that "'the right secured by the Second Amendment is not unlimited.'" Slip op. 6 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). The Court also reaffirmed that firearms may be prohibited in sensitive places, including schools and government buildings. And the Court addressed key methodological issues in ways that bolster the Attorney General's approach to the historical analysis in this case. Under the analysis modeled in *Rahimi*, the challenged provisions of SB 2 are constitutional, and this Court should vacate the preliminary injunction.

# ARGUMENT

**I.  *RAHIMI*'S GUIDANCE ABOUT THE METHODOLOGICAL APPROACH TO THE SECOND AMENDMENT ANALYSIS**

*Rahimi* involved 18 U.S.C. § 922(g)(8)(C)(i), a federal statute that prohibits possession of firearms by persons who are subject to domestic violence restraining orders based on a credible threat of physical harm to an intimate partner or child. Slip op. 1. The Fifth Circuit analyzed section

922(g)(8) in light of *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022), and held that the statute violates the Second Amendment because it "does not fit within our tradition of firearm regulation." Slip op. 5. The Supreme Court granted certiorari and reversed in an 8-1 decision.

The Supreme Court observed that "some courts have misunderstood the methodology of our recent Second Amendment cases," and noted that those "precedents were not meant to suggest a law trapped in amber." Slip op. 7. The Court explained that the history-and-tradition approach articulated in *Bruen* "involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* (emphasis added). To demonstrate consistency with those principles, the government need not identify "a 'dead ringer' or a 'historical twin.'" *Id.* at 8. Instead, the government need only show that "the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 7.

The Court applied that analytical framework to section 922(g)(8). It identified "two distinct legal regimes" relevant to its analysis: surety laws and prohibitions on "going armed" in public. Slip op. 10-13. It then distilled from those regimes the applicable Second Amendment principle. "Taken together," the Court explained, those laws "confirm what common

2

sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id*. at 13.

The Court acknowledged that section 922(g)(8) is "by no means identical" to the surety and going armed laws, but recognized that "it does not need to be" because the statute "fits neatly within the tradition the surety and going armed laws represent." Slip op. 13-14. Ultimately, the Court had "no trouble" concluding that section 922(g)(8) falls within this regulatory tradition, which "allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 16.

Apart from Justice Thomas, the lone dissenter, every member of the Court joined the Chief Justice's majority opinion in full. Several justices wrote concurring opinions, and Justices Barrett and Kavanaugh focused on methodological points that may be particularly relevant here.

Justice Barrett explained that "a challenged regulation need not be an updated model of a historical counterpart," and that "imposing a test that demands overly specific analogues has serious problems." Barrett conc. 3-4. Instead, "'[a]nalogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." *Id.* at 4.

Justice Kavanaugh's concurrence described why "[p]re-ratification American history can shed light on constitutional meaning in various ways,"

3

and why "post-ratification history—sometimes referred to as tradition—can also be important." Kavanaugh conc. 6, 10.

## II. *RAHIMI* SUPPORTS THE ATTORNEY GENERAL'S ARGUMENTS FOR REVERSAL

### A. *Rahimi* reaffirms that sensitive places restrictions in schools and government buildings are permissible and support analogous restrictions

Plaintiffs in these cases have disputed whether schools and government buildings are sensitive places where firearms may be prohibited. Among other things, they have resisted the Attorney General's analogies between schools and similar places where children congregate—such as playgrounds and youth centers. *See Carralero* AB 19-20, 26-27; *May* AB 17-19, 38-39.

*Rahimi* confirms that the Supreme Court meant what it said about schools and government buildings in its prior decisions—and that those sensitive places remain a valid point of comparison for the challenged provisions of SB 2. The *Rahimi* majority reaffirmed the Court's prior statement that "many" firearms prohibitions "are 'presumptively lawful.'" Slip op. 15 (citing *Heller*, 554 U.S. at 626-627 & n.26). The passage *Rahimi* cited from *Heller* listed "longstanding prohibitions," including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626-627.

4

Two of the concurring opinions made this point more explicitly. Justice Kavanaugh quoted *Heller*'s statement about sensitive places laws, observing that *Heller* "recognized" those regulations as one of the "categories of traditional exceptions to the [Second Amendment] right" for which restrictions "are presumptively constitutional." Kavanaugh conc. 22-23 (citing *Heller*, 554 U.S. at 626-627); *see id.* at 23 (noting that *McDonald v. Chicago*, 561 U.S. 742, 786 (2010) "reiterated the presumed constitutionality" of such regulations).

And to illustrate her point that "[h]istorical regulations reveal a principle, not a mold," Justice Barrett invoked what she called the "'sensitive places' principle that limits the right to public carry." Barrett conc. 4 (citing *Bruen*, 597 U.S. at 30-31). Her concurrence echoes the Court's sensitive places analysis in *Bruen* and its statement that "courts can use analogies to . . . historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30.[1]

---

[1] This Court recently stated in *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), that "'[s]imply repeat[ing] *Heller*'s language' about the 'presumptive[] lawful[ness]'" of certain laws is inadequate and that "courts

5

### B. *Rahimi* supports the Attorney General's methodological approach and rejects Plaintiffs' analysis

#### 1. The government need only show consistency with principles that underpin a regulatory tradition

*Bruen* held that the government need not identify a "historical *twin*" or "dead ringer" to defend a challenged regulation, and explained that what matters is whether modern regulations are "relevantly similar" to historical ones. 597 U.S. at 29-30. Yet some courts have "struggled" to evaluate whether modern regulations are relevantly similar to historical ones. Barrett conc. 3; *see also* slip op. 7. "One difficulty is the level of generality problem: Must the government produce a founding-era relative of the challenged regulation—if not a twin, a cousin?" Barrett conc. 3. "Or," alternatively, "do founding-era gun regulations yield concrete principles that mark the borders of the right?" *Id.*

*Rahimi* answers that question. The government need not show that the challenged regulation is "an updated model of a historical counterpart."

---

must now analyze 'sensitive place' laws by analogizing them to a sufficiently comparable historical counterpart." *Id*. at 668, 669. *Bruen* itself evaluated sensitive places regulations under the history-and-tradition approach and instructed that analogies to those longstanding regulations can support *other* sensitive places laws—just as the Attorney General is arguing here. *See Bruen*, 597 U.S. at 30-31. In any event, the United States has filed a petition for rehearing en banc in *Duarte* (No. 22-50048); that petition is currently pending.

6

Barrett conc. 4; *see also* slip op. 7-8. That "narrower approach," which demands a "founding-era relative," is how the Fifth Circuit went astray in *Rahimi*. Barrett conc. 3. Instead, the government's task is to show that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." Slip op. 7; *see id.* at 7-8 ("The law must comport with the principles underlying the Second Amendment"). Historical analogues remain important, but they "reveal a principle, not a mold." Barrett conc. 4.

*Rahimi* shows what it means to assess modern regulations in light of principles reflected in tradition. The Court drew on aspects of "two distinct legal regimes" to extract a single, "common sense" principle: that individuals may be disarmed when they "pose[] a clear threat of physical violence to another." Slip op. 10, 13; *see also id.* at 10-13. The Court then assessed whether section 922(g)(8) comports with that principle, and readily concluded that it does—even though the modern statute "is by no means identical" to either of the founding-era legal regimes. *Id.* at 13-16.

*Rahimi* vindicates the Attorney General's approach here. The Attorney General has identified dozens of relevantly similar historical regulations, and has also explained why many of the challenged provisions are comparable to sensitive places restrictions the Supreme Court has already recognized as valid. *See* OB 21-51, 54-56. The Attorney General also identified broader

7

principles that underpin historical sensitive places regulation—such as the principle that governments may ban firearms in places where vulnerable people congregate. *See* OB 13-17; *see also, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 339 (2d Cir. 2023) (identifying a "tradition of firearm regulation in locations where vulnerable populations are present").[2]

Plaintiffs have criticized those sensitive places principles as "vague," *May* AB 15, and "far too broad," *Carralero* AB 24, but that level of generality is no broader than the threat-of-violence principle the Supreme Court applied in *Rahimi*. Indeed, because the evidence overwhelmingly establishes that the "more nuanced approach" triggered by "unprecedented societal concerns or dramatic technological changes," *Bruen*, 597 U.S. at 27, is implicated for many of the sensitive places at issue in this case, *see, e.g.*, OB 27 (explaining the dramatic technological advances in transportation), the relevant regulatory principles, if anything, should be defined at a *higher* level of generality than in *Rahimi*, where every member of the Court

---

[2] On July 2, 2024, the Supreme Court granted a petition for a writ of certiorari in *Antonyuk*, vacated the Second Circuit's decision, and remanded for further consideration in light of *Rahimi*. Such an order is not a reversal on the merits. *See Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001). We reference the *Antonyuk* decision for the persuasive value of its prior reasoning.

appeared to accept that section 922(g)(8) addresses a societal problem that has existed since the founding, *see* slip op. 7; Thomas dis. 7.

### 2. The government may rely on a broad range of historical evidence

*Rahimi* also rejects Plaintiffs' argument that pre-ratification analogues may be discounted as "too early" or "too old," *Carralero* AB 29, 47, and that many post-ratification analogues may be dismissed as too recent, *see*, *e.g.*, *May* AB 25-26; *Carralero* AB 17. As Justice Kavanaugh explained, Second Amendment analysis properly encompasses both "pre-ratification and post-ratification history." Kavanaugh conc. 24; *see id.* at 6-16 (explaining these points at length). *Rahimi* relied on laws and traditions that long predate the founding. *See* slip op. 10 (invoking surety tradition dating back to the time of Canute, an 11th century ruler); *id.* at 12 (same for 14th century Statute of Northampton). *Rahimi* likewise relied on surety laws enacted in the mid-19th century, long after the ratification of the Second Amendment. *See* slip op. 12 (citing *Bruen*, 597 U.S at 56 & n.23, which gathered laws enacted between 1838 and 1868).[3]

---

[3] In *Rahimi*, the Court deemed it unnecessary to decide whether courts should rely primarily on the understanding of the Second Amendment that prevailed in 1791 or 1868. Slip op. 8 n.1.

9

*Rahimi* also rebuts Plaintiffs' argument that local and territorial laws should be given little or no weight. *See May* AB 23; *Carralero* AB 18, 45-46, 49, 51. *Rahimi* relied on surety laws from two territories and the District of Columbia. *See* Slip op. 12 (citing *Bruen*, 597 U.S at 56 & n.23, which included an 1838 Wisconsin territorial law, 1851 Minnesota territorial law, and 1857 District of Columbia law).

Moreover, *Rahimi* undercuts Plaintiffs' assertion that state statutes alone supply the historical evidence that matters. *See May* AB 7, 30; *Carralero* AB 26, 44. *Rahimi* noted that prohibitions on "going armed" were "incorporated into American jurisprudence through the common law," and relied on Blackstone's commentaries as an independent historical source. Slip op. 13-14. The Court's pragmatic approach to these non-statutory sources makes sense, given its recognition that the proper analysis turns on "the principles underlying the Second Amendment." Slip op. 8. Because the government need not show one-to-one correspondence between the challenged regulation and any single "founding-era relative," Barrett conc. 3, there is no reason to ignore non-statutory sources that reflect a relevant regulatory principle.

Finally, *Rahimi* confirms that historical analogues that fail to support one modern regulation may still support other regulations. Plaintiffs have

10

argued that *Bruen* "unequivocally" rejected the Statute of Northampton—one of the Attorney General's proffered analogues—as a relevant source. *Carralero* AB 47. Yet *Rahimi* relied on that statute and other going armed laws in upholding section 922(g)(8). *See* slip op. 12-13. And *Rahimi* expressly rejected the notion that surety laws are irrelevant in every Second Amendment challenge just because the Court concluded that surety laws were insufficient to uphold total bans on all public carry in *Bruen*. *Id*. at 15-16.[4]

### 3. The government need not identify a certain quota of historical analogues

Plaintiffs have claimed that the government must identify numerous historical analogues to support a challenged regulation. *See May* AB 7 (arguing that "a few" analogues are insufficient); *Carralero* AB 17-18 (asserting that analogues must be "present in many states" and that laws from "only a few jurisdictions" are insufficient). As explained above, the

---

[4] Likewise, the fact that a given analogue supports one regulatory principle does not foreclose the possibility that it also might support a different principle. *Rahimi* focused on one aspect of the going armed laws: their prohibition on threatening conduct. Slip op. 12-13. The going armed laws also support a tradition of banning firearms in especially crowded places like fairs and markets—places where the mere presence of guns is likely to be dangerous regardless of any individual's threatening conduct. *See* OB 32-35; *see also Antonyuk*, 89 F.4th at 356-357 & n.74; *id.* at 374.

Attorney General did in fact identify numerous relevantly similar analogues for each of the challenged provisions of SB 2. *See* OB 21-51, 54-56. In any event, *Rahimi* demonstrates why Plaintiffs' claim is mistaken.

*Bruen*'s discussion of sensitive places indicated that even one or two historical analogues may support an enduring tradition of regulation so long as there is no contrary evidence suggesting those analogues were deemed unlawful. *See* OB 11 (citing *Bruen*, 597 U.S. at 30); *see also Antonyuk*, 89 F.4th at 303-304. *Rahimi* is consistent with that understanding. For example, the Court identified only four state or colonial going armed statutes, yet found those laws relevant to form a tradition and establish a principle of regulation. *See* slip op. 13. The clear implication of *Rahimi* is that no fixed number of historical analogues is required.[5]

*Rahimi* also touches on a related point: historical silence is not always a strike against the government. Justice Barrett explained in her concurrence that courts should not "assume that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." Barrett conc. 4. And that understanding of

---

[5] Relatedly, Plaintiffs have suggested that the government must identify historical analogues that covered "large swaths of the population," *Carralero* AB 17-18, or a certain percentage of the nation's people, *see May* AB 40-42. But *Rahimi* makes no reference to any such requirement.

historical silence is implicit in the majority's opinion, which combined elements of "two distinct legal regimes" to derive the relevant regulatory principle because there was no single founding-era law that banned possession in the same manner as section 922(g)(8). Slip op. 10.

This point about historical silence is particularly important in the sensitive places context. Private rules, customs, and practices likely reduced the need for direct legislation. *See* ARB 19; *Antonyuk*, 89 F.4th at 301-302. And because many of the sensitive places covered by SB 2 did not exist in the late 18th century—or did not exist in their modern form—legislative silence at the founding is unlikely to be instructive.

### C. *Rahimi*'s application of the historical analysis demonstrates why reversal is warranted here

Beyond its statements about sensitive places and its clarification of the proper analogical method, *Rahimi* serves as a model for how *Bruen*'s history-and-tradition analysis should be conducted. In particular, *Rahimi* shows how courts should assess the fit between the relevant Second Amendment principle and the challenged regulation.

In his *Rahimi* dissent, Justice Thomas argued at length that the burdens imposed by section 922(g)(8) "places [it] in an entirely different stratum from surety laws." Thomas dis. 20; *see id.* at 18-21. He also critiqued in

13

detail the majority's reliance on going armed laws, asserting that those laws "had a dissimilar burden *and* justification." *Id.* at 21; *see id.* at 21-26. He criticized the majority for "mixing and matching historical laws" to "cobble[] together" a broader principle, *id.* at 26, and for failing to identify "a single historical regulation with a comparable burden and justification," *id.* at 27.

Yet despite these criticisms, the *Rahimi* majority had "no trouble" upholding the challenged statute. Slip op. 16. It concluded that section 922(g)(8) "fits neatly within the tradition the surety and going armed laws represent." *Id.* at 13-14; *see id.* at 5 (concluding that the statute "fits comfortably"); Barrett conc. 5 (commenting that it "fits well within" the relevant principle). And the majority squarely rejected Justice Thomas's assertion that the surety and going armed laws "are not sufficiently similar," faulting him for repeating the Fifth Circuit's error of "read[ing] *Bruen* to require a 'historical twin.'" Slip op. 16. Finally, *Rahimi* emphasized the facial nature of the defendant's challenge to section 922(g)(8), explaining that the Fifth Circuit took the wrong approach because "[r]ather than consider the circumstances in which [the statute] was most likely to be constitutional, the panel instead focused on hypothetical scenarios where [it] might raise constitutional concerns." *Id.*

14

The outcome of these appeals should track the outcome in *Rahimi*. Under the methodology applied in *Rahimi*, the challenged provisions of SB 2 fall well within the principles that underpin our nation's tradition of firearms regulation. And like the Fifth Circuit in *Rahimi*, the lower court here erred by enjoining provisions in their entirety—even when plaintiffs have not challenged all applications. *See, e.g.,* OB 49-50 (explaining why the district court erred in enjoining SB 2's parking lot provision in its entirety, even as to the parking areas of unchallenged sensitive places).

## CONCLUSION

The district court's injunction should be reversed.

Dated: July 12, 2024

Respectfully submitted,

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
MARK R. BECKINGTON
*Supervising Deputy Attorneys General*

s/ Robert L. Meyerhoff
ROBERT L. MEYERHOFF
*Deputy Attorney General*
*Attorneys for Defendant-Appellant*

15

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** 23-4354 and 23-4356

I am the attorney or self-represented party.

**This brief contains 3,105 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[x] complies with the length limit designated by court order dated June 21, 2024.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Robert L. Meyerhoff  **Date**  July 12, 2024